## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1) UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Case No. CIV-18-647-C |
| 2) THE HINTON TELEPHONE COMPANY | ) | |
| OF HINTON, OKLAHOMA, INC. | ) | |
| d/b/a HINTON TELEPHONE COMPANY | ) | |
| | ) | |
| Defendant. | ) | |
| ‎_____ | ) | |

## **COMPLAINT FOR RECOVERY OF MONETARY FORFEITURE**

Plaintiff, the United States of America, by and through its attorneys, hereby brings this action against Defendant, The Hinton Telephone Company of Hinton, Oklahoma, Inc. ("Hinton"), pursuant to 47 U.S.C. § 504, for the recovery of a monetary forfeiture assessed against Defendant by the Federal Communications Commission for violations of the Communications Act of 1934 and various federal regulations implementing that Act.

### **JURISDICTION AND VENUE**

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and 47 U.S.C. § 504(a).

2. Venue is proper pursuant to 28 U.S.C. §§ 1355(b), 1391(b), 1395(a), and 47 U.S.C. § 504(a), because Defendant's principal operating office is in Hinton, Oklahoma, a location within the Western District of Oklahoma.

## PARTIES

3.      Plaintiff is the United States of America.

4.      Defendant is an Oklahoma-based company that has provided telecommunications services to parts of Caddo County and other counties in Oklahoma. As such, Defendant is subject to regulation by the Federal Communications Commission.

5.      Defendant's principal operating office is located at 200 West Main Street, Hinton, Oklahoma, 73047.

## STATUTORY AND REGULATORY PROVISIONS

6.      The Federal Communications Commission ("FCC" or "Commission") is an agency of the United States that regulates intrastate, interstate, and foreign radio communications pursuant to the Communications Act of 1934, as amended, 47 U.S.C. § 151 *et seq.*

7.      Any "person who is determined by the Commission . . . to have . . . willfully or repeatedly failed to comply with any of the provisions of terms and conditions of any license, permit, certificate, or other instrument or authorization issued by the Commission . . . or of any rule, regulation, or order issued by the Commission under this chapter . . . shall be liable to the United States for a forfeiture penalty." 47 U.S.C. § 503(b)(1).

8.      Congress has decreed that forfeitures assessed by the FCC shall be "payable into the Treasury of the United States" and shall be "recoverable . . . in a civil suit in the name of the United States." 47 U.S.C. § 504(a).

9.      "In determining the amount of . . . a forfeiture penalty, the Commission . . . shall take into account the nature, circumstances, extent and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E).

## 911 Requirements of Telecommunications Providers

10.     In the Wireless Communications and Public Safety Act of 1999, Pub. L. No. 106-81, 113 Stat. 1286 (codified at 47 U.S.C. §§ 251, 615) (911 Act), Congress directed the Commission to make 911 the universal emergency telephone number in the United States for wireline and wireless telephone service for reporting an emergency to appropriate authorities and requesting assistance, and to encourage and support the development of comprehensive emergency communications throughout the United States so that all jurisdictions offer seamless networks for prompt emergency service.

11.     Section 64.3001 of Title 47 of the *Code of Federal Regulations* ("47 C.F.R.") requires that telecommunications carriers, such as Defendant, must transmit all 911 calls to a Public Safety Answering Point (PSAP),  to a designated statewide default answering point, or to an appropriate local emergency authority.

12.     A PSAP is "[a] facility that has been designated to receive 911 calls and route them to emergency services personnel." 47 C.F.R. § 64.3000(c).

13.     A statewide default answering point is "[a]n emergency answering point designated by the State to receive 911 calls for either the entire State or those portions of the State not otherwise serviced by a local PSAP." *Id.* § 64.3000(d).

14.     An appropriate local emergency authority is defined as "[a]n emergency answering point that has not been officially designated as a Public Safety Answering Point (PSAP), but has the capability of receiving 911 calls and either dispatching emergency services personnel or, if necessary, relaying the call to another emergency service provider. An appropriate local emergency authority may include, but is not limited to, an existing local law enforcement authority, such as the police, county sheriff, local emergency medical services provider, or fire department." *Id.* § 64.3000(b).

15.     47 C.F.R. § 64.3002(d) provides, "Where no PSAP nor statewide default answering point has been designated, and no appropriate local emergency authority has been selected by an authorized state or local entity, telecommunications carriers shall identify an appropriate local emergency authority, based on the exercise of reasonable judgment, and complete all translation and routing necessary to deliver 911 calls to such appropriate local emergency authority no later than September 11, 2002."

16.     Pursuant to 47 C.F.R. § 64.3002(e), once a PSAP has been designated for an area where none had existed as of December 11, 2001, telecommunications carriers shall complete the translation and routing necessary to deliver 911 calls to that PSAP within nine months of such designation.

## FACTUAL BACKGROUND

17.     Defendant provides local, long distance telephone (through AT&T), television, and Internet service for approximately 1400 subscribers in Caddo County, Oklahoma, and

approximately 2,700 customers overall in parts of Caddo, Canadian, Custer, and Washita Counties in Oklahoma.

18.     On May 6, 2013, the FCC's Public Safety and Homeland Security Bureau (PSHSB) received a complaint from the Caddo County E911 Communications Center (Caddo County PSAP) alleging that Defendant was not providing basic 911 service to its customers in Caddo County, Oklahoma.

19.     Specifically, the complaint alleged that Defendant was not properly routing basic 911 calls to the Caddo County PSAP, but instead was routing 911 calls to an automated AT&T operator service. The automated operator message instructed the caller, who had already dialed 911, to hang up and dial 911 if the call was an emergency or to dial zero or remain on the line for additional assistance.

20.     On August 1, 2013, Defendant, after being advised by PSHSB staff of the Caddo County PSAP complaint, informed PSHSB staff that Hinton previously had routed 911 calls from its Caddo County customers to a live AT&T operator, who then routed the calls to the appropriate emergency authority. According to Defendant, AT&T subsequently discontinued its live operator service and substituted an automated operator to handle operator assisted calls.

21.     PSHSB staff directed Defendant on August 1, 2013, to immediately implement a basic 911 solution for its Caddo County customers by routing 911 calls to either the local sheriff's office or to the Caddo County PSAP.

22.     Defendant subsequently informed PSHSB staff that, as of August 5, 2013, 911 calls from its Caddo County customers were being routed to the Caddo County PSAP.

23.     Thereafter, PSHSB referred this matter to the FCC's Enforcement Bureau for investigation.

## PROCEDURAL HISTORY

24.     In January 2014, the FCC Enforcement Bureau's Spectrum Enforcement Division commenced an investigation by directing Defendant to respond to a series of inquiries (Letters of Inquiry) into Defendant's provision of basic 911 service. *See* Notice of Apparent Liability ("NAL") Exhibit "A" at 3.

25.      In its responses to the Letters of Inquiry, Defendant explained that Caddo County did not approve the Caddo County PSAP until December 2012, and that Defendant did not receive a request to direct trunks to the Caddo County PSAP until January 7, 2013. *See id*.

26.     In addition, Defendant asserted that, prior to the designation of the Caddo County PSAP, the State of Oklahoma had not designated a statewide default emergency number answering point for Caddo County residents, and that no county or other local entity had agreed to accept 911 calls in Caddo County. *Id*.

27.     Defendant also explained that in August 2002 the Caddo County Sheriff's Office specifically declined to accept 911 calls from its Caddo County customers due to a lack of personnel and resources. *Id*.

28.     Defendant stated that the only feasible means of routing 911 calls was to direct such calls to a live AT&T operator for connection to a list of county emergency offices provided to the live operator by Defendant. *Id.*

29.     According to Defendant, the company received no prior notice from AT&T regarding the switch from a live operator to an automated operator message and first learned of the switch from a 911 test call it performed on May 6, 2013. *Id.*

30.     Defendant admitted that for three months it continued to route 911 calls to the automated operator message-*i.e.,* from May 6, 2013 until August 5, 2013. *Id.*

31.     Defendant argued that it was reasonable for it to continue to route 911 calls on its network to the automated operator service for five reasons. First, Defendant stated that it faced technical challenges that limited its call routing options. Second, Defendant asserted that, due to restrictions imposed by the Oklahoma Corporation Commission, Defendant did not provide long distance service or operator service, but instead routed long distance and operator assistance calls to AT&T's tandem office in Oklahoma City, Oklahoma. Third, Defendant claimed that Caddo County offices had not established direct trunking to Defendant's switch, which Defendant asserted was technically necessary for it to route 911 calls to such locations. Fourth, Defendant contended that the Oklahoma Corporation Commission advised Defendant that it could continue to route 911 calls to the AT&T operator until such time that the Caddo County PSAP was operational. Defendant further stated that it notified its customers via mail-outs and newspaper notices of the limitations of Defendant's 911 service in Caddo County, and instructed its customers who needed emergency assistance

to contact the appropriate authorities directly. Fifth, Defendant noted that within four days of the August 1, 2013, call by PSHSB informing Defendant that its 911 solution was inadequate it successfully began routing 911 dialed calls to the Caddo County PSAP. *Id.* at 3-4.

## Notice of Apparent Liability

32.     On or about October August 4, 2014, the FCC issued a Notice of Apparent Liability ("NAL") to Defendant, reporting a preliminarily finding that Defendant had willfully and repeatedly violated sections 64.3001 and 64.3002(d) of the Commission's Rules by failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message. *In the Matter of the Hinton Tel. Co. of Hinton, Oklahoma, Inc., d/b/a Hinton Tel. Co.*, 29 F.C.C. Rcd. 9228 (2014), attached as Exhibit "A."

33.     The FCC noted that prior to the approval and designation of the Caddo County PSAP, there was no designated PSAP in Caddo County, Oklahoma; the State of Oklahoma had not designated a statewide default answering point; and neither the State of Oklahoma nor any Caddo County governmental entity had requested that Defendant route 911 calls from its Caddo County customers to any specified local emergency authority. NAL at 4, para. 9.

34.     The FCC stated that while it may have been reasonable for Defendant to route 911 calls to AT&T's live operator under such circumstances, the FCC rejected Defendant's contention that it exercised reasonable judgment by continuing to route 911 calls to AT&T's operator service after May 6, 2013, when it learned that 911 calls on its network were being routed to an automated operator. *Id.*

35.     Moreover, the FCC found that Defendant allowed the unreasonable practice of routing 911 calls to AT&T's automated operator to continue until August 5, 2013, when Defendant began routing calls to the Caddo County PSAP. Until August 5, 2013, individuals with an immediate need for emergency assistance who had already dialed 911 were directed by the automated operator to "hang up and dial 911," an instruction that on its face was manifestly unreasonable. NAL at 5.

36.     Once Defendant learned on May 6, 2013, that 911 calls from its Caddo County customers were being routed to an automated message, Defendant was obligated, consistent with the requirements of Section 64.3002(d) of its Rules, to reassess its call routing protocols and ascertain whether, based on the exercise of reasonable judgment, there was an alternative appropriate local emergency authority to which it could route its 911 calls. NAL at 5.

37.     Defendant admitted that even after it learned that its Caddo County customers' 911 calls were being routed to an automated message service, Defendant made no effort to identify such an alternative appropriate local emergency authority, nor did Defendant attempt to contact a local authority, such as the Caddo County Sheriff's Office, to determine whether it would temporarily accept the routing of 911 calls. *Id.*

38.     Moreover, the FCC found no evidence that Defendant contacted AT&T to request that it either reactivate its live operator or, at a minimum, modify the automated message to state, for example, that a 911 caller should press zero to be connected immediately to a live operator. *Id.*

39.     Finally, once requested by PSHSB staff to implement a basic 911 solution, Defendant proved able to do so within four days. *Id*. at 5-6.

40.     Accordingly, the FCC found that Defendant apparently violated Sections 64.3001 and 64.3002(d) of its Rules by failing to exercise reasonable judgment in the identification of an appropriate local emergency authority to which to route 911 calls from its Caddo County customers. 47 C.F.R. §§ 64.3001 and 3002(d).

41.     The FCC noted that the Commission's *Forfeiture Policy Statement* and Section 1.80 of its Rules do not establish a base forfeiture for violation of Sections 64.3001 and 64.3002, 47 C.F.R., but that the Commission has, nevertheless, found that the "omission of a specific rule violation from the list ... [establishing base forfeiture amounts] should not signal that the Commission considers any unlisted violation as nonexistent or unimportant." NAL at 7, para. 13, quoting *Forfeiture Policy Statement*, 12 FCC Rcd 17087, 17099, para. 22 (1997).

42.     Having considered the statutory factors and precedent, the FCC found that the gravity and the extent of Defendant's apparent willful and repeated failure to provide 911 service in compliance with 47 C.F.R. §§ 64.3001 and 64.3002(d), warranted a significant forfeiture. The FCC noted that violations of the 911 requirements are extremely serious given the critical function these requirements serve in promoting and safeguarding life and property. NAL at 7, para. 14.

43.     In assessing the forfeiture penalty, the FCC also considered that Defendant continued to route 911 calls to the AT&T automated operator service for approximately three

months—from May 6, 2013, when Defendant claims it discovered the change, to August 5, 2013, when Defendant commenced routing 911 calls to the Caddo County PSAP. NAL at 7-8.

44.     Based on the evidence in the record and the forfeiture adjustment factors, including the extended duration of the violation, the FCC proposed a forfeiture of $100,000. NAL at 8, para. 14.

45.     The Notice ordered Defendant to pay the full amount of the proposed forfeiture, or to file a written statement seeking reduction or cancellation of the proposed forfeiture, within 30 days of the date of the Notice. NAL at 8, para. 16.

46.     The FCC sent a copy of the Notice to Defendant by certified mail, return receipt requested and first class mail. The FCC received the signed return receipt for the copy sent by certified mail. The copy sent by regular first class mail was not returned.

## **Defendant's Response to NAL**

47.     On September 3, 2014, Defendant timely filed a response to the NAL. Exhibit "B" (Defendant response to NAL).

48.     In its response, Defendant argued, in support of its claim that it exercised "reasonable judgment" in continuing to route 911 calls to AT&T's operator for three months after it learned those calls were being sent to an automated message service that it: (1) sought the advice of Oklahoma Corporation Commission staff, Exhibit "B" at ii, 5; (2) placed notices in local newspapers and in customer bills informing customers they could reach various emergency numbers more quickly by dialing them directly, Exhibit "B" at ii-iii; and (3)

analyze[d] various potential workarounds to bridge the gap until Caddo County's pending E911 service was implemented." Exhibit "B" at iii.

49.     Defendant  requested that the proposed forfeiture be cancelled or rescinded on the basis of its long history of regulatory compliance, its successful efforts to bring 911 and/or #911 services to four other Oklahoma counties, and its claim that it undertook reasonable efforts to bring 911 and E911 services to Caddo County, Oklahoma. Exhibit "B" at 13.

### Forfeiture Order

50.      The FCC issued a Forfeiture Order on March 18, 2015, affirming the forfeiture penalty proposed in the NAL. *In the Matter of the Hinton Tel. Co. of Hinton, Oklahoma, Inc., d/b/a Hinton Tel. Co.*, 30 F.C.C. Rcd. 2308 (2015), attached as Exhibit "C" (Forfeiture Order). The FCC rejected the arguments the Defendant presented in response to the NAL, finding that Defendant had failed to exercise reasonable judgment in continuing to route 911 calls to AT&T's operator service for three months after discovering that AT&T had replaced its voice operator service with an automated message.

51.     The FCC also noted that Defendant's compliance record was not spotless and its successful provision of 911 and E911 services in other Oklahoma counties does not excuse or mitigate its failure over an extended period of time to use reasonable judgment in routing 911 calls in Caddo County. Moreover, the FCC found that any good-faith efforts taken by Defendant to comply with the Rules following the Enforcement Bureau's investigation was expected and generally does not serve to mitigate a forfeiture. Finally, the FCC found that

forfeiture cancellation or reduction is not warranted because Defendant failed to establish financial hardship.

52.     Based on the record before it and in light of the applicable statutory factors, the FCC concluded that Defendant willfully and repeatedly violated Sections 64.3001 and 64.3002(d) of the Rules by failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message for an extended period of time.

53.     The FCC sent a copy of the Order to Defendant by certified mail, return receipt requested, and first class mail. The FCC received the signed return receipt for the copy sent by certified mail. The copy sent by regular first class mail was not returned.

54.     The Order required Defendant to pay the full amount of the proposed forfeiture by April 17, 2015, or the case would be referred to the Department of Justice for enforcement pursuant to section 504(a) of the Act.[1]  As of the date of the filing of this Complaint, the FCC has not received any payment from Defendant.

## COUNT 1
## DEFENDANT VIOLATED THE FCC'S 911 REQUIREMENTS
### (47 C.F.R. §§ 64.3001 and 64.3002(d))

55.     Plaintiff repeats and realleges as if set forth fully herein, the foregoing paragraphs 1 through 56, inclusive.

56.     Violations of the 911 requirements are extremely serious given the critical function these requirements serve in promoting and safeguarding life and property.

---

[1] Defendant filed a Petition for Reconsideration of the forfeiture order (Exhibit "D"), which the Enforcement Bureau denied on October 27, 2015. Exhibit "E" (Order on Petition for Reconsideration).

57.     Defendant first learned that its 911 calls were being directed to an automated operator message on May 6, 2013.

58.     From May 6, 2013, until August 5, 2013, Defendant continued to route 911 calls to the automated operator message.

59.     Defendant's failure to properly route 911 calls violated 47 C.F.R. §§ 64.3001 and 64.3002(d).

60.     Defendant's failure to properly route 911 calls was willful. *See* 47 U.S.C. § 503(b)(1)(B).

61.     Defendant's violation of the authorization requirement was continuing and repeated until August 5, 2013, when Defendant commenced routing 911 calls to the Caddo County PSAP. *See* 47 U.S.C. § 503(b)(1)(B).

62.     In exercising its authority to assess a forfeiture, the FCC is required to take into account "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require." 47 U.S.C. § 503(b)(2)(E).

63.     The FCC's imposition of the $100,000 forfeiture penalty on Defendant for its violation of 47 C.F.R. §§ 64.3001 and 64.3002(d) was appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against Defendant, as follows:

a.     Judgment in the amount of $100,000;

      b.     Interest from the date of judgment at the legal rate in effect on the date of judgment, pursuant to 28 U.S.C. § 1961;

      c.     Costs and disbursements incurred by Plaintiff in this action; and

      d.     Such other further relief that the Court may deem just and proper.

Date:  July 3, 2018.             Respectfully submitted,

                         ROBERT J. TROESTER
                         Acting United States Attorney

                         *s/ Robert Don Evans, Jr.*
                         R.D. EVANS, JR.
                         Assistant United States Attorney
                         Louisiana Bar Number 20805
                         210 Park Avenue, Suite 400
                         Oklahoma City, OK 73102
                         (405) 553-8700
                         (405) 553-8884 fax
                         E-mail:   don.evans@usdoj.gov

| **Federal Communications Commission** | **DA 14-1070** |
|---|---|

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| In the Matter of | ) | |
| | ) | |
| The Hinton Telephone Company | ) | File No.: EB-SED-14-00016210[1] |
| of Hinton, Oklahoma, Inc., | ) | |
| d/b/a Hinton Telephone Company | ) | NAL/Acct. No.: 201432100027 |
| | ) | |
| | ) | FRN: 0004365334 |

### NOTICE OF APPARENT LIABILITY FOR FORFEITURE

**Adopted: August 4, 2014**          **Released: August 4, 2014**

By the Acting Chief, Enforcement Bureau:

### I.    INTRODUCTION

1.    911 is the single most critical tool for citizen emergency communications. The American public universally relies upon 911 in a time of crisis. When there is an emergency, citizens can, should, and do trust that when they call 911, someone will answer the phone. The Hinton Telephone Company of Hinton, Oklahoma, Inc. (Hinton) undermined that trust and betrayed its customers when for several months in 2013 it apparently routed 911 calls from Caddo County, Oklahoma, to an automated AT&T operator message which instructed callers to "hang up and dial 911" if their call is an emergency. That trust was further betrayed when Hinton allegedly continued to allow 911 calls to be routed to the automated message for three months after the company discovered the problem. The company returned the system to functionality only after being contacted by FCC investigators and directed to do so. This is manifestly unacceptable. This betrayal is particularly egregious and dangerous for a rural community like Caddo County, Oklahoma, whose residents may be far from help and most in need of reliable and efficient emergency communications. The Commission's 911 rules are intended to ensure that emergency calls are routed properly and always result in contact with public safety personnel. Hinton apparently failed to use reasonable judgment in routing its Caddo County customers' 911 calls, willfully and repeatedly violating our rules, and created a significant threat to the life and property of the residents of Caddo County, Oklahoma. This is unconscionable and warrants a substantial penalty. We propose to fine Hinton $100,000.

2.    As discussed below, Hinton, a local exchange carrier serving parts of Caddo and other counties in Oklahoma,[2] apparently willfully and repeatedly violated Sections 64.3001 and 64.3002(d) of the Commission's rules (Rules) by failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message.[3]

---

[1] The investigation initiated under File No. EB-SED-13-00010169 was subsequently assigned File No. EB-SED-14-00016210. Any future correspondence with the FCC concerning this matter should reflect the new case number.

[2] Hinton provides local, long distance (through AT&T), television, and Internet service for approximately 1400 subscribers in Caddo County, the affected area, and approximately 2,700 customers overall in parts of Caddo, Canadian, Custer, and Washita Counties in Oklahoma. Hinton is designated as an Eligible Telecommunications Carrier by the Oklahoma Corporation Commission. *See* Oklahoma Corporation Commission website, available at http://www.occeweb.com/pu/ETC%20Designation/2014-06-12ETCInformationreport.pdf (last visited July 23, 2014).

[3] 47 C.F.R. §§ 64.3001, 64.3002(d).

EXHIBIT "A"

## II.   BACKGROUND

3.      Pursuant to Section 64.3001 of the Rules, telecommunications carriers, such as Hinton, are required to transmit all 911 calls to a Public Safety Answering Point (PSAP),[4] to a designated statewide default answering point,[5] or to an appropriate local emergency authority.[6]  Section 64.3002(d) of the Rules provides that:

> Where no PSAP nor statewide default answering point has been designated, and no appropriate local emergency authority has been selected by an authorized state or local entity, telecommunications carriers shall identify an appropriate local emergency authority, based on the exercise of reasonable judgment, and complete all translation and routing necessary to deliver 911 calls to such appropriate local emergency authority no later than September 11, 2002.[7]

4.      On May 6, 2013, the Commission's Public Safety and Homeland Security Bureau (PSHSB) received a complaint from the Caddo County E911 Communications Center (Caddo County PSAP) alleging that Hinton was not providing basic 911 service to its customers in Caddo County, Oklahoma.[8]  Specifically, the complaint alleged that Hinton was not properly routing basic 911 calls to the Caddo County PSAP, but instead was routing 911 calls to an automated AT&T operator service.  The automated operator message instructed the caller, who had already dialed 911, to hang up and dial 911 if the call was an emergency or to dial zero or remain on the line for additional assistance.[9]

5.      On August 1, 2013, after being advised by PSHSB staff of the Caddo County PSAP complaint, Hinton informed PSHSB staff that Hinton previously had routed 911 calls from its Caddo County customers to a live AT&T operator, who then routed the calls to the appropriate emergency authority.  According to Hinton, AT&T subsequently discontinued its live operator service and substituted an automated operator to handle operator assisted calls.  PSHSB staff directed Hinton to immediately implement a basic 911 solution for its Caddo County customers by routing 911 calls to either the local sheriff's office or to the Caddo County PSAP.  Hinton subsequently informed PSHSB staff that, as of August 5, 2013, 911 calls from its Caddo County customers were being routed to the Caddo County PSAP.  Thereafter, PSHSB referred this matter to the Enforcement Bureau (Bureau) for investigation.

---

[4] A PSAP is "[a] facility that has been designated to receive 911 calls and route them to emergency services personnel." *Id.* § 64.3000(c).

[5] A statewide default answering point is "[a]n emergency answering point designated by the State to receive 911 calls for either the entire State or those portions of the State not otherwise serviced by a local PSAP." *Id.* § 64.3000(d).

[6] An appropriate local emergency authority is "[a]n emergency answering point that has not been officially designated as a [PSAP], but has the capability of receiving 911 calls and either dispatching emergency services personnel or, if necessary, relaying the call to another emergency service provider.  An appropriate local emergency authority may include, but is not limited to, an existing local law enforcement authority, such as the police, county sheriff, local emergency medical services provider, or fire department." *Id.* § 64.3000(b).

[7] *Id.* § 64.3002(d).

[8] Basic 911 networks, in contrast to E911 networks, are not capable of taking into account the caller's location, but simply forward all 911 calls from a particular public switch telephone network to the appropriate public safety authority. *See Framework for Next Generation 911 Deployment*, Notice of Inquiry, 25 FCC Rcd 17869, 17874–75, para. 13 (2010).

[9] The complainant submitted a recording purported to be the message heard by a caller dialing 911 on Hinton's network, which stated: "Hinton Telephone Company. The local time is. . . . If this call is an emergency, hang up and dial 911. To place a call, press one. If you need additional assistance, press zero for the operator or remain on the line. To hear your options again, press star."

EXHIBIT "A"

6.       The Bureau's Spectrum Enforcement Division subsequently commenced an investigation by directing Hinton to respond to a series of inquiries into Hinton's provision of basic 911 service.[10]   In its responses, Hinton explains that Caddo County did not approve the Caddo County PSAP until December 2012, and that Hinton did not receive a request to direct trunks to the Caddo County PSAP until January 7, 2013.[11]   In addition, Hinton asserts that, prior to the designation of the Caddo County PSAP, the State of Oklahoma had not designated a statewide default emergency number answering point for Caddo County residents, and that no county or other local entity had agreed to accept 911 calls in Caddo County.[12]   Hinton also explains that, in August 2002, the Caddo County Sheriff's Office specifically declined to accept 911 calls from its Caddo County customers due to a lack of personnel and resources,[13] and that the only feasible means of routing 911 calls was to direct such calls to a live AT&T operator for connection to a list of county emergency offices provided to the live operator by Hinton.[14]   According to Hinton, the company received no prior notice from AT&T regarding the switch from a live operator to an automated operator message and first learned of the switch from a 911 test call it performed on May 6, 2013.[15]   Hinton admits, however, that for three months it continued to route 911 calls to the automated operator message—i.e., until August 5, 2013.[16]

7.       Hinton argues that it was reasonable for it to continue to route 911 calls on its network to the automated operator service. First, Hinton states that it faced technical challenges that limited its call routing options.[17]   Second, Hinton asserts that, due to restrictions imposed by the Oklahoma Corporation Commission, Hinton does not provide long distance service or operator service, but instead routes long

---

[10] *See* Letter from John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kenneth Doughty, CEO, Hinton Telephone Company (Jan. 27, 2014) (on file in EB-SED-14-00016210); Letter from John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kenneth Doughty, CEO, Hinton Telephone Company (July 10, 2014) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (May 30, 2014, 12:48 EDT) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (Jun. 12, 2014, 15:57 EDT) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (July 15, 2014, 12:33 EDT) (on file in EB-SED-14-00016210).

[11] *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau (June 18, 2014) (on file in EB-SED-14-00016210) (Fourth LOI Response), Attachment at 4.  Pursuant to Section 64.3002(e) of the Rules, once a PSAP has been designated for an area where none had existed as of December 2001, telecommunications carriers must complete the translation and routing necessary to deliver 911calls to that PSAP within nine months of such designation.  47 C.F.R. § 64.3002(e).

[12] *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau (March 10, 2014) (on file in EB-SED-14-00016210) (First LOI Response), Attachment at 1; *see also* Fourth LOI Response, Attachment at 4.

[13] *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau (June 10, 2014) (on file in EB-SED-13-00016210) (Third LOI Response), Attachment at 2.

[14] *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau (May 27, 2014) (on file in EB-SED-14-00016210) (Second LOI Response), Attachment at 1.

[15] Third LOI Response, Attachment at 1.

[16] Fourth LOI Response, Attachment at 1.

[17] According to Hinton, it was technically infeasible for Hinton's switch to selectively route 911 calls in Caddo County to multiple telephone numbers. *See id.*, Attachment at 1–4.

EXHIBIT "A"

distance and operator assistance calls to AT&T's tandem office in Oklahoma City, Oklahoma.[18] Third, Hinton claims that Caddo County offices had not established direct trunking to Hinton's switch, which Hinton asserts was technically necessary for it to route 911 calls to such locations.[19] Fourth, Hinton contends that the Oklahoma Corporation Commission advised Hinton that it could continue to route 911 calls to the AT&T operator until such time that the Caddo County PSAP was operational.[20] In further justification of its actions, Hinton states that it notified its customers via mail-outs and newspaper notices of the limitations of Hinton's 911 service in Caddo County, and instructed its customers who needed emergency assistance to contact the appropriate authorities directly.[21] Finally, Hinton notes that within four days of the August 1, 2013 call by PSHSB informing Hinton that its 911 solution was inadequate, it successfully began routing 911 dialed calls to the Caddo County PSAP.[22]

## III.    DISCUSSION

### A.    Failure to Transmit 911 Calls Adequately

8.      In the 911 Act, Congress directed the Commission to make 911 the universal emergency telephone number in the United States for wireline and wireless telephone service "for reporting an emergency to appropriate authorities and requesting assistance," and to encourage and support the development of comprehensive emergency communications throughout the United States so that all jurisdictions offer seamless networks for prompt emergency service.[23] In those areas where no PSAP or statewide default answering point has been designated, and where no appropriate local emergency authority has been selected by an authorized state or local entity to receive 911 calls, Section 64.3002(d) of the Rules imposes on telecommunications carriers the obligation to "identify an appropriate local emergency authority, based on the exercise of reasonable judgment, and complete all translation and routing necessary to deliver 911 calls to such appropriate local emergency authority no later than September 11, 2002."[24]

9.      Based on the record before us, it appears that, prior to the approval and designation of the Caddo County PSAP, there was no designated PSAP in Caddo County, Oklahoma; the State of Oklahoma had not designated a statewide default answering point; and neither the State of Oklahoma nor any Caddo County governmental entity had requested that Hinton route 911 calls from its Caddo County customers to any specified local emergency authority.[25] While it may have been reasonable for Hinton to route 911 calls to AT&T's live operator under these circumstances,[26] we reject Hinton's contention that it exercised

---

[18] Fourth LOI Response, Attachment at 2; Second LOI Response, Attachment at 1.

[19] Fourth LOI Response, Attachment at 2;

[20] *Id.*, Attachment at 1–2.

[21] *See id.*, Attachment at 1.

[22] *See* Third LOI Response, Attachment at 1.

[23] Wireless Communications and Public Safety Act of 1999, Pub. L. No. 106-81, 113 Stat. 1286 (codified at 47 U.S.C. §§ 251, 615) (911 Act).

[24] 47 C.F.R. § 64.3002(d).

[25] *See* First LOI Response at 1–2.

[26] Because the 911 Act does not explicitly define the term "appropriate authorities," the Commission defined the term, for purposes of the 911 Act, "to include emergency answering points such as county sheriff offices (i.e., governmental entities), volunteer fire departments (i.e., non-governmental entities), or other similar points that are effectively functioning as PSAPs for purposes of receiving emergency calls, and, if necessary, relaying the calls to other emergency service providers, for the purpose of responding to emergencies." *Implementation of 911 Act*, Fifth Report and Order, Memorandum Opinion and Order on Reconsideration, 16 FCC Rcd 22264, 22271, para. 14 (2001). *See also* 47 C.F.R. § 64.3000(b) (defining "appropriate local emergency authority" as "[a]n emergency answering point that has not been officially designated as a [PSAP], but has the capability of receiving 911 calls and either dispatching emergency services personnel or, if necessary, relaying the call to another emergency service (continued....)

EXHIBIT "A"

reasonable judgment by *continuing* to route 911 calls to AT&T's operator service after May 6, 2013, when it learned that 911 calls on its network were being routed to an automated operator. Moreover, Hinton allowed that unreasonable practice to continue until August 5, 2013, when it began routing calls to the Caddo County PSAP in response to the request from PSHSB staff.[27] As the Commission has stated, 911 service is intended to provide fast response to emergency situations by having a national three-digit number to dial and connecting 911 dialed calls to trained individuals who have ready access to police, fire, and health emergency service providers.[28] Caddo County residents who attempted to call 911 for emergency assistance were not connected to a live operator with the ability to immediately route the call to appropriate emergency response personnel. Instead, individuals with an immediate need for emergency assistance and who had already called 911 were directed to "hang up and dial 911," an instruction that on its face was manifestly unreasonable. Indeed, the only way a 911 caller could access a live operator to route its call to the appropriate emergency authority would be to ignore the message's instruction—to "hang up and dial 911"—and instead press zero and wait for the live operator to answer, which unnecessarily and unreasonably delayed customers' access to emergency personnel.[29]

10.     We find that, once Hinton learned that 911 calls from its Caddo County customers were being routed to an automated message, Hinton was obligated, consistent with the requirements of Section 64.3002(d) of the Rules, to reassess its call routing protocols and ascertain whether, based on the exercise of reasonable judgment, there was an alternative appropriate local emergency authority to which it could route its 911 calls. In this regard, Hinton admits that even after it learned that its Caddo County customers' 911 calls were being routed to an automated message service, Hinton made no effort to identify such an alternative appropriate local emergency authority, or that it even attempted contact with any such local authorities, such as the Caddo County Sheriff's Office, to determine whether they would temporarily accept the routing of 911 calls.[30] Moreover, there is no evidence that Hinton even contacted AT&T to request that it either reactivate its live operator or, at a minimum, modify the automated message to state, for example, that a 911 caller should press zero to be connected immediately to a live operator. Finally, once requested by PSHSB staff to implement a basic 911 solution, Hinton proved able to do so within four days. Accordingly, we find that Hinton apparently violated Sections 64.3001 and

(Continued from previous page) ─────────────────────
provider.  An appropriate local emergency authority may include, but is not limited to, an existing local law enforcement authority, such as the police, county sheriff, local emergency medical services provider, or fire department.").

[27] Although it appears that Hinton faced certain technical and other impediments to routing 911 calls from its Caddo County customers directly to an appropriate local emergency authority, *see supra* para. 6, we note that many of the technical limitations identified by Hinton related to its deployment of an enhanced 911 solution, and not the provision of basic 911 service.

[28] *See Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Call Systems,* Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 18676, 18678, para. 3 (1996).

[29] Hinton's assertion that a representative of the Oklahoma Corporation Commission advised Hinton in early May 2013 that it could continue to route 911 calls to the AT&T operator (Fourth LOI Response, Attachment at 2) does not alter our conclusion.  Indeed, Hinton's response does not clearly explain which 911 routing arrangement the Oklahoma Corporation Commission allegedly approved, and Hinton has provided no documentary evidence to support its assertion.

[30] *See* Fifth LOI Response, Attachment at 1.  On January 7, 2013, approximately four months prior to the date that Hinton claims it discovered that AT&T had switched from a live operator to an automated message service, Hinton received a request to direct trunks to the Caddo County PSAP. *See* Fourth LOI Response, Attachment at 1–2. Although Section 64.3002(e) of the Rules provides that once a PSAP has been designated for an area where none had existed as of December 2001, telecommunications carriers have nine months to complete the translation and routing necessary to deliver 911calls to that PSAP (47 C.F.R. § 64.3002(e)), the fact that Hinton was able to route calls to the Caddo County PSAP within only four days of being directed to do by PSHSB suggests that Hinton, with the exercise of reasonable diligence, could have commenced the routing of 911 calls to the Caddo County PSAP prior to August 5, 2013.

EXHIBIT "A"

64.3002(d) of the Rules by failing to exercise reasonable judgment in the identification of an appropriate local emergency authority to which to route 911 calls from its Caddo County customers.

### B.     Proposed Forfeiture

11.     Under Section 503(b)(1)(B) of the Communications Act of 1934, as amended (Act), any person who is determined by the Commission to have willfully or repeatedly failed to comply with any provision of the Act or any rule, regulation, or order issued by the Commission shall be liable to the United States for a forfeiture penalty.[31]  Section 312(f)(1) of the Act defines "willful" as the "conscious and deliberate commission or omission of [any] act, irrespective of any intent to violate" the law.[32]  The legislative history to Section 312(f)(1) of the Act clarifies that this definition of willful applies to both Sections 312 and 503(b) of the Act,[33] and the Commission has so interpreted the term in the Section 503(b) context.[34]  The Commission may also assess a forfeiture for violations that are merely repeated, and not willful.[35]  The term "repeated" means the commission or omission of an act more than once or for more than one day.[36]  Based on the record before us, we conclude that Hinton is apparently liable for a forfeiture for its failure to adequately route 911 calls in apparent willful and repeated violation of Sections 64.3001 and 63.3002(d) of the Rules.[37]

12.     Section 503(b)(2)(B) of the Act authorizes a forfeiture assessment against a common carrier up to $150,000 for each violation, or for each day of a continuing violation, up to a maximum of $1,500,000 for a single act or failure to act.[38]  In exercising such authority, we are required to take into

---

[31] 47 U.S.C. § 503(b)(1)(B); *see also* 47 C.F.R. § 1.80(a).

[32] *Id.* 47 § 312(f)(1).

[33] H.R. Rep. No. 97-765, 97th Cong. 2d Sess. 51 (1982) ("This provision [inserted in Section 312] defines the terms 'willful' and 'repeated' for purposes of section 312, and for any other relevant section of the act (e.g., Section 503) . . . . As defined[,] . . . 'willful' means that the licensee knew that he was doing the act in question, regardless of whether there was an intent to violate the law.  'Repeated' means more than once, or where the act is continuous, for more than one day.  Whether an act is considered to be 'continuous' would depend upon the circumstances in each case.  The definitions are intended primarily to clarify the language in Sections 312 and 503, and are consistent with the Commission's application of those terms . . . .").

[34] *See, e.g., Southern California Broadcasting Co.*, Memorandum Opinion and Order, 6 FCC Rcd 4387, 4388, para. 5 (1991), *recon. denied*, 7 FCC Rcd 3454 (1992).

[35] *See, e.g., Callais Cablevision, Inc.*, Notice of Apparent Liability for Monetary Forfeiture, 16 FCC Rcd 1359, 1362, para. 10 (2001) (*Callais Cablevision, Inc.*) (proposing a forfeiture for, *inter alia*, a cable television operator's repeated signal leakage).

[36] Section 312(f)(2) of the Act, 47 U.S.C. § 312(f)(2), provides that "[t]he term 'repeated,' when used with reference to the commission or omission of any act, means the commission or omission of such act more than once or, if such commission or omission is continuous, for more than one day."  *See Callais Cablevision, Inc.*, 16 FCC Rcd at 1362, para. 9.

[37] 47 C.F.R. §§ 64.3001, 64.3002(d).

[38] 47 U.S.C. § 503(b)(2)(B); *see also* 47 C.F.R. § 1.80(b)(2).  These amounts reflect inflation adjustments to the forfeitures specified in Section 503(b)(2)(B) of the Act ($100,000 per violation or per day of a continuing violation and $1,000,000 per any single act or failure to act).  The Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890, as amended by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, Sec. 31001, 110 Stat. 1321 (DCIA), requires the Commission to adjust its forfeiture penalties periodically for inflation.  *See* 28 U.S.C. § 2461 note (4).  The Commission most recently adjusted its penalties to account for inflation in 2013.  *See Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, 28 FCC Rcd 10785 (Enf. Bur. 2013); *see also Inflation Adjustment of Monetary Penalties*, 78 Fed. Reg. 49370–01 (2013) (setting March. 13, 2013, as the effective date for the increases).  Because the DCIA specifies that any inflationary adjustment "shall apply only to violations which occur after the date the increase takes effect," however, we apply the forfeiture penalties in effect at the time the violation took place.  28 U.S.C. § 2461 note (6).

EXHIBIT "A"

account "the nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[39]

13.    The Commission's *Forfeiture Policy Statement*[40] and Section 1.80 of the Rules[41] do not establish a base forfeiture for violation of Sections 64.3001 and 64.3002 of the Rules.  The Commission has, nevertheless, found that the "omission of a specific rule violation from the list . . . [establishing base forfeiture amounts] should not signal that the Commission considers any unlisted violation as nonexistent or unimportant.  The Commission expects, and it is each licensee's obligation to know and comply with all Commission's rules."[42]  Thus, the Commission retains its discretion to issue forfeitures on a case-by-case basis,[43] and has assessed forfeiture liability for rule violations irrespective of whether corresponding base forfeiture amounts have been established.[44]

14.    Having considered the statutory factors and precedent,[45] we find that the gravity and the extent of Hinton's apparent willful and repeated failure to provide 911 service in compliance with Sections 64.3001 and 64.3002(d) of the Rules warrant a significant forfeiture.  In this regard, we note that the Commission has found that violations of the 911 requirements are extremely serious given the critical function these requirements serve in promoting and safeguarding life and property.[46]  We also take into

---

[39] 47 U.S.C. § 503(b)(2)(E).  *See also* 47 C.F.R. § 1.80(b)(5), Note to paragraph (b)(5): Section II. Adjustment Criteria for Section 503 Forfeitures.

[40] *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines,* Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied,* 15 FCC Rcd 303 (1999).

[41] 47 C.F.R. § 1.80.

[42] *Forfeiture Policy Statement,* 12 FCC Rcd at 17099, para. 22.

[43] *Id.*

[44] *See, e.g., Sprint Nextel Corp.,* Notice of Apparent Liability for Forfeiture, 22 FCC Rcd 16414, 16417–18, paras. 9–10 (2007) (proposing a $1,325,000 forfeiture irrespective of the absence of an established base forfeiture for failure to comply with deadline for 95% E911 location-capable handset penetration) (forfeiture paid) (*Sprint Nextel*); *A-O Broad. Corp.,* Forfeiture Order, 18 FCC Rcd 27069, para.  22 (2003), *aff'd,* Memorandum Opinion and Order, 20 FCC Rcd 756 (2005) (assessing a $25,000 forfeiture irrespective of the absence of an established base forfeiture for violations of radio frequency exposure limits); *Callais Cablevision, Inc.,* Forfeiture Order, 17 FCC Rcd 22626, 22630, paras. 19–20 (2002) (assessing an aggregate $133,000 forfeiture irrespective of the absence of an established base forfeiture for violations of the cable signal leakage standards); *Midwest Television, Inc.,* Notice of Apparent Liability for Forfeiture, 20 FCC Rcd 3959, 3965, para. 15 (Enf. Bur. 2005) (proposing a $20,000 forfeiture irrespective of the absence of an established base forfeiture for failure to broadcast emergency information accessible to hearing impaired viewers).

[45] *See, e.g., Cardinal Broadband, LLC,* Notice of Apparent Liability for Forfeiture and Order, 23 FCC Rcd 12224, 12231, para. 19 (Enf. Bur. 2008) (proposing a $25,000 forfeiture against a VoIP carrier for failing to provide 911 service) (forfeiture paid) (*Cardinal Broadband*); *Dobson Cellular Sys., Inc. & Am. Cellular Corp.,* Notice of Apparent Liability for Forfeiture, 21 FCC Rcd 4684, 4707, para. 61 (2006) (proposing a total $750,000 forfeiture against two commonly-owned wireless carriers for failure to provide E911 Phase I service in response to valid PSAP requests in nine instances and failure to provide E911 Phase II service in response to valid PSAP requests in 41 instances) (subsequent history omitted); *Lamar Cnty. Cellular, Inc.,* Notice of Apparent Liability for Forfeiture, 21 FCC Rcd 4375, 4378–80, paras. 14–18 (Enf. Bur. 2006) (proposing a $12,000 forfeiture against a wireless carrier for failure to provide E911 Phase I service in response to valid PSAP request) (forfeiture paid).

[46] *See Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems,* Second Memorandum Opinion and Order, 14 FCC Rcd 20850 (1999), *clarified,* Order, 16 FCC Rcd 18982 (2001); *see also Cardinal Broadband,* 23 FCC Rcd at 12231, para. 19; *Sprint Nextel,* 22 FCC Rcd at 16418, para. 10; *T-Mobile USA, Inc.,* Notice of Apparent Liability for Forfeiture, 18 FCC Rcd 3501, 3504, para. 7 (2003) (forfeiture paid).

EXHIBIT "A"

consideration that Hinton continued to route 911 calls to the AT&T automated operator service for approximately three months—from May 6, 2013, when Hinton claims it discovered the change, to August 5, 2013, when Hinton commenced routing 911 calls to the Caddo County PSAP.[47]  Based on the evidence in the record and our forfeiture adjustment factors, including the extended duration of the violation, we propose a forfeiture of $100,000.

## IV.    ORDERING CLAUSES

15.    Accordingly, **IT IS ORDERED** that, pursuant to Section 503(b) of the Communications Act of 1934, as amended, and Sections 0.111, 0.311, and 1.80 of the Commission's rules,[48] The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company is **NOTIFIED** of its **APPARENT LIABILITY FOR A FORFEITURE** in the amount of one hundred thousand dollars ($100,000) for willful and repeated violation of Sections 64.3001 and 64.3002(d) of the Commission's rules.[49]

16.    **IT IS FURTHER ORDERED** that, pursuant to Section 1.80 of the Commission's rules,[50] within thirty (30) calendar days after the release date of this Notice of Apparent Liability for Forfeiture, The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company **SHALL PAY** the full amount of the proposed forfeiture, or **SHALL FILE** a written statement seeking reduction or cancellation of the proposed forfeiture consistent with paragraph 18 below.

17.    The payment of the forfeiture must be made by check or similar instrument, wire transfer, or credit card, and must include the NAL/Account Number and FRN referenced above.  The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company shall send electronic notification of payment to JoAnn Lucanik at JoAnn.Lucanik@fcc.gov, Josh Zeldis at Josh.Zeldis@fcc.gov, and Samantha Peoples at Sam.Peoples@fcc.gov on the date said payment is made. Regardless of the form of payment, a completed FCC Form 159 (Remittance Advice) must be submitted.[51]  When completing the FCC Form 159, enter the Account Number in block number 23A (call sign/other ID) and enter the letters "FORF" in block number 24A (payment type code).  Below are additional instructions The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company should follow based on the form of payment it selects:

- Payment by check or money order must be made payable to the order of the Federal Communications Commission.  Such payments (along with the completed Form 159) must be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  To complete the wire transfer and ensure appropriate crediting of the wired funds, a completed Form 159 must be faxed to U.S. Bank at (314) 418-4232 on the same business day the wire transfer is initiated.

- Payment by credit card must be made by providing the required credit card information on FCC Form 159 and signing and dating the Form 159 to authorize the credit card payment.

---

[47] We also find that that Hinton's asserted efforts to inform its customers of the limitations of its 911 service do not mitigate the severity of Hinton's apparent violation.  These efforts, while laudable, did not excuse Hinton from complying with its obligation to transmit and route 911 dialed calls to an appropriate emergency authority.

[48] 47 U.S.C. § 503(b); 47 C.F.R. §§ 0.111, 0.311, 1.80.

[49] 47 C.F.R. §§ 64.3001, 64.3002(d).

[50] 47 C.F.R. § 1.80.

[51] An FCC Form 159 and detailed instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

EXHIBIT "A"

The completed Form 159 must then be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

18.     Any request for making full payment over time under an installment plan should be sent to: Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, S.W., Room 1-A625, Washington, DC 20554.[52] If The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company has questions regarding payment procedures, it should contact the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

19.     The written statement seeking reduction or cancellation of the proposed forfeiture, if any, must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to Sections 1.16 and 1.80(f)(3) of the Commission's rules.[53]  The written statement must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street, S.W., Washington, DC 20554, ATTN: Enforcement Bureau—Spectrum Enforcement Division, and must include the NAL/Account Number referenced in the caption.  The statement must also be e-mailed to JoAnn Lucanik at JoAnn.Lucanik@fcc.gov, Josh Zeldis at Josh.Zeldis@fcc.gov, and Samantha Peoples at Sam.Peoples@fcc.gov.

20.     The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the petitioner submits: (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status. Any claim of inability to pay must specifically identify the basis for the claim by reference to the financial documentation.

21.     **IT IS FURTHER ORDERED** that a copy of this Notice of Apparent Liability for Forfeiture shall be sent by first class mail and certified mail, return receipt requested, to Kenneth Doughty, Chief Executive Officer, The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company, 200 West Main Street, Hinton, Oklahoma, 73047 and to Kendall Parrish, Commingdeer & Associates, 6011 North Robinson Avenue, Oklahoma City, Oklahoma 73118.

FEDERAL COMMUNICATIONS COMMISSION

Travis LeBlanc
Acting Chief
Enforcement Bureau

---

[52] *See* 47 C.F.R. § 1.1914.

[53] 47 C.F.R. §§ 1.16, 1.80(f)(3).

EXHIBIT "A"

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | File No. EB-SED-14-00016210 |
| | ) | |
| The Hinton Telephone Company | ) | NAL/Acct No. 201432100027 |
| of Hinton, Oklahoma, Inc. d/b/a | ) | |
| Hinton Telephone Company | ) | FRN:  0004365334 |

TO: Enforcement Bureau – Spectrum Enforcement Division


**HINTON TELEPHONE COMPANY OF
HINTON, OKLAHOMA, INC.**

Gerard J. Duffy
Richard D. Rubino

Blooston, Mordkofsky, Dickens
 Duffy & Prendergast, LLP
2120 L Street, N.W., Suite 300
Washington, DC  20037
Tel. (202) 659-0830


Dated:  September 3, 2014


EXHIBIT "B"

i

## **Table of Contents**

**Response to Notice of Apparent Liability for Forfeiture**....................................1

Hinton Tel has an Excellent Record of Regulatory Compliance.............................2

Hinton Tel Has Exercised Reasonable Judgment in Caddo County.........................3

A \$100,000 Forfeiture Will Have an Adverse impact on Hinton Tel's Ability to
Construct and Deploy Broadband Service......................................................11

Conclusion.............................................................................................13

ii

## Summary

The Hinton Telephone Company of Hinton, Oklahoma, Inc. ("Hinton Tel") requests cancellation in its entirety of a proposed $100,000 forfeiture for alleged willful and repeated violation of Sections 64.3001 and 64.3002(d) of the Commission's Rules due to Hinton Tel's alleged failure to use "reasonable judgment" when it purportedly continued to route 911 calls for a portion of Caddo County, Oklahoma, to an automated operator message during the period from May 6, 2013, to August 6, 2013.

First, Hinton Tel is a 64-year old rural telephone company with an excellent record of compliance with the Commission's Rules and of provision of quality and reliable service to its rural Oklahoma customers, including the furnishing of 911 and E911 services to an area that comprises portions of five separate Oklahoma counties.

Second, Hinton Tel acted reasonably and appropriately to address the very difficult and unusual circumstances of providing 911 and E911 services in Caddo County.   Hinton Tel directed its Caddo County 911 calls to the live AT&T operators in Oklahoma City in 2002 only after it was unable to convince its local Town of Hinton Police Department and the Caddo County Sheriff's Office to accept 911 calls.  This alternative worked without complaint or incident for almost eleven years, until AT&T switched to an automated operator service without giving Hinton Tel any notice or advance warning. At the time that Hinton Tel learned of the AT&T change on May 6, 2013, it had already been working diligently with Caddo County, the County's database contractor Geocomm, and AT&T to implement the County's E911 service. Hinton Tel immediately discussed the AT&T change with the OCC staff, and was heartened by the response that "it was not doing anything wrong" with respect to its 911 service.  Nonetheless,

EXHIBIT "B"

iii

Hinton Tel expeditiously advised its Caddo County customers in newspaper notices and bill inserts that they could reach local police, fire and ambulance services more rapidly by dialing their direct numbers rather than 911, and listed all of the relevant agency numbers. Whereas Hinton Tel did not implement the Caddo County 911 Director's proposed "fix" because it would have required complex and risky translation changes in its EWSD switch that would have disrupted and impaired the E911 service of its customers in other counties, it proceeded to develop and analyze various potential workarounds to bridge the gap until Caddo County's pending E911 service was implemented. Whereas all of these alternatives posed technical or legal problems, Hinton Tel was able to implement the least worst of them within two business days after it was ordered to act by the Commission. The fact that Hinton Tel was able to respond to the FCC's August 1 so rapidly is a testament to the fact that Hinton Tel had acted responsibly by developing and testing various alternatives so that the initial leg-work was already completed when the FCC mandated action.

Finally, imposition of the Commission's proposed $100,000 forfeiture will not have any positive impact upon 911 and E911 services within Hinton Tel's service area, but rather will punish Hinton Tel's rural Oklahoma customers by depriving it of resources that it urgently needs to upgrade its broadband facilities and services.

EXHIBIT "B"

Before the
**FEDERAL COMMUNICATIONS COMMISSION**
Washington, D.C. 20554

| In the Matter of | ) | File No. EB-SED-14-00016210 |
|---|---|---|
| | ) | |
| The Hinton Telephone Company | ) | NAL/Acct No. 201432100027 |
| of Hinton, Oklahoma, Inc. d/b/a | ) | |
| Hinton Telephone Company | ·) | FRN: 0004365334 |

TO: Enforcement Bureau – Spectrum Enforcement Division

## **RESPONSE TO NOTICE OF APPARENT LIABILITY FOR FORFEITURE**

The Hinton Telephone Company of Hinton, Oklahoma, Inc. ("Hinton Tel" or the

"Company"), by its attorneys and pursuant to Section 503(b)(4)(C) of the Communications Act

of 1934, as amended (the "Act"), and Section 1.80(f)(3) of the Commission's Rules, submits its

Response to the *Notice of Apparent Liability for Forfeiture*, DA-14-1070, released August 4,

2014 ("*NALF*").[1] The *NALF* found Hinton Tel apparently liable for a monetary forfeiture in the

amount of $100,000 for alleged willful and repeated violation of Sections 64.3001 and

64.3002(d) of the Commission's Rules due to Hinton Tel's alleged failure to use "reasonable

judgment" when it purportedly continued to route 911 calls for a portion of Caddo County,

Oklahoma, to an automated operator message during the period from May 6, 2013, to August 6,

2013.

Hinton Tel respectfully requests cancellation of the proposed forfeiture in its entirety.

First, Hinton Tel is a 64-year old rural telephone company with an excellent record of

compliance with the Commission's Rules and of provision of quality and reliable service to its

rural Oklahoma customers, including the furnishing of 911 and E911 services to an area that

comprises portions of five separate Oklahoma counties. Second, Hinton Tel acted reasonably

and appropriately to address the very difficult and unusual circumstances of providing 911 and

---

[1] This response is supported by the attached Affidavit of Kenneth Doughty, President of Hinton Tel.

EXHIBIT "B"

2

E911 services in Caddo County. Third, imposition of the Commission's proposed $100,000

forfeiture will not have any positive impact upon 911 and E911 services within Hinton Tel's

service area, but rather will punish Hinton Tel's rural Oklahoma customers by depriving it of

resources that it urgently needs to upgrade its broadband facilities and services.

### *Hinton Tel Has an Excellent Record of Regulatory Compliance*

Hinton Tel is well aware of its regulatory obligations, and has had an excellent record of

federal and state regulatory compliance since it began operations in 1950. With one possible

inadvertent exception,[2] Hinton Tel's efforts to comply with the Commission's policies and

regulations have produced a virtually spotless FCC compliance record during the course of its

64-year existence. Hinton Tel has never knowingly or deliberately violated any Commission

regulation, including the 911 and E911 rules at issue in this proceeding.

Hinton Tel also has an excellent record of providing reliable, quality and affordable

telecommunications services to the rural Oklahoma communities and residents that it serves.

This record includes reliable and quality 911, E911 and other public safety services. In

particular, Hinton Tel notes that it serves portions of five rural Oklahoma counties: Blaine,

Caddo, Canadian, Custer and Washita Counties. It has worked successfully with the

governments and public safety officials of Blaine, Canadian, Custer and Washita Counties to

satisfy their 911 and/or E911 service needs, requests and timetables without substantial

---

[2] In 1991, the Commission's former Mobile Services Division proposed to fine Hinton Tel. $7,500 for completing an internal stock reorganization consisting of a *pro forma* transfer of the stock of its then controlling stockholder John R. Hollis to the John R. Hollis 1988 Revocable Trust for which Mr. Hollis was the Trustee. *The Hinton Telephone Company of Hinton, Oklahoma, Inc.*, Notice of Apparent Liability for Forfeiture, File No. 63500-92-1-BFW, DA 91-1464, released November 27, 1991. At that time, many small companies did not realize that estate planning and other internal reorganizations that involved *pro forma* stock transfers without changes in management or family control could trigger Commission application requirements, particularly where radio licenses were held. In the subject case, the Division reduced its proposed forfeiture from $10,000 to $7,500 because Hinton Tel had voluntarily reported the transaction once it realized that a Commission application had been required. Due to the passage of almost 23 years, Hinton Tel and its attorneys have not been able to determine at this time whether the proposed $7,500 forfeiture was ultimately paid, or whether it was further reduced or cancelled.

EXHIBIT "B"

3

controversies and without any complaints to this Commission or the Oklahoma Corporation

Commission ("OCC").

### *Hinton Tel Exercised Reasonable Judgment in Caddo County*

The Commission needs to recognize that Hinton Tel faced very unique, complicated and

difficult circumstances in the fifth of its counties -- Caddo County.  As indicated by

Commissioner Benny Bowling of the Caddo County Board of Commissioners:

> I am aware that there was a complaint filed with the FCC concerning the provisioning of
> E911 service in Caddo County here in Oklahoma and that there were some challenges for
> all parties involved that came up during the process.
>
> There were frustrations for all involved in the process and there were delays in some
> areas of the county but working together we got the job done. Hinton Telephone
> Company had its challenges with the process as well but I think they did their part as well
> and as fast as they could considering they were trying to stay within the regulatory rules
> they operate under.
>
> I know that Hinton Telephone Company is doing a good job serving their subscribers
> with telephone service and building broadband service to the rural areas. I believe Hinton
> Telephone Company wants to do whatever is best for their subscribers and I feel that they
> did that in the provisioning of the E911 service as well.

Letter, dated August 18, 2014, from Benny Bowling, Commissioner, Caddo County Board of
Commissioners, to John Zeldis, Spectrum Enforcement Division, Enforcement Bureau (attached
as Exhibit A).

Commissioner Bowling's letter has been quoted in its entirety because it is a calm and

fair-minded analysis by a responsible local elected official who was close enough to observe and

understand Caddo County's 911 and E911 issues.  No one in Caddo County will dispute that

these matters were complicated and difficult; that there were significant problems, delays and

frustrations; and that everyone was trying to do their best under novel and trying circumstances.

Hinton Tel serves the northern part of Caddo County (2000 population: 29,600; 2012

population: 29,678), in and around the Town of Hinton (2000 population: 2,175; 2012

population: 3,212).  To understand the events during the period from May 6, 2013, to August 6,

EXHIBIT "B"

4

2013, one has to go back to the long-term and continuing difficulties that Hinton Tel has encountered in providing 911 services to its portion of Caddo County. Section 64.3001 of the Commission's Rules requires carriers like Hinton Tel to route all 911 calls to either (a) a Public Safety Answering Point ("PSAP"); (b) a designated statewide default answering point; or (c) an appropriate local emergency authority. Unfortunately, Caddo County did not have a PSAP, and the State of Oklahoma had not (and still has not) established a designated statewide default answering point. Looking for an appropriate local emergency authority, Hinton Tel first attempted during 2000 and 2001 to get the Town of Hinton's Police Department to establish a PSAP or 911 call center for the northern part of Caddo County. The Town ultimately determined that the project would not be feasible, particularly since the fees generated from a potential 911 surcharge would not be sufficient to cover the costs of staffing and operating a full-time PSAP or 911 call center. Hinton Tel next turned to the Caddo County Sheriff's Office, but that agency declined to accept 911 calls for Caddo County after August 2002 due to a shortage of personnel and resources.

When the Section 64.3001 options are unavailable, Section 64.3002(d) of the Rules requires carriers like Hinton Tel to utilize "reasonable judgment" in the selection of a local emergency authority and to complete all translation and routing necessary to deliver 911 calls as appropriate. After Hinton Tel was unable to convince any local Caddo County emergency authority to accept 911 calls, it had no viable alternative but to route all 911 calls for Caddo County to a live AT&T operator in Oklahoma City, Oklahoma, who would then transfer such calls to the appropriate Caddo County first responder or other agency. AT&T's long distance network and operator service were the only option because the OCC has precluded Hinton Tel

EXHIBIT "B"

5

and other incumbent local exchange carriers ("ILECs") from providing long distance services within the State of Oklahoma.[3]

This 911 arrangement worked well from July 2002 until early 2013 without any complaints from Caddo County government agencies or residents. However, at some unknown date prior to May 6, 2013, AT&T replaced its live operators in Oklahoma City with an automated system which apparently gave Caddo County 911 callers the option of: (1) hanging up and dialing 911; or (2) dialing "0" and waiting for a live operator. AT&T did not notify Hinton Tel when it made this change, much less give Hinton Tel any advance notice of the change or work with it to develop an appropriate transition and/or alternative arrangements. Rather, Hinton Tel found out about the AT&T change via a test call made by its personnel on Monday, May 6, 2013. Note, however, that while it was not requested by or satisfactory to Hinton Tel, the AT&T change did not force Caddo County 911 callers onto a nonsensical loop where they were repeatedly told by an automated message to hang up and dial 911 in the event of an emergency. Instead, Caddo County 911 callers were able to dial "0" and be transferred to a live operator.

Hinton Tel responded immediately to this precipitous and unanticipated change by considering and analyzing its compliance options. By mid-afternoon on Tuesday, May 7, 2013, both Garry Findley of Hinton Tel and Ron Comingdeer, Hinton's counsel (in addition to Debbie (Brown) Davis, Caddo County 911 Director), had brought the matter to the attention of the OCC staff and sought its advice. Mr. Commingdeer's report of his conversation with Jim Jones of the OCC was that Mr. Jones "seemed comfortable that [Hinton Tel] has not done anything wrong and in fact was providing 911 but was not providing E911 yet due to Caddo County not having everything in place" (E-mail from Ron Comingdeer to Ken Doughty dated May 7, 2013, attached

---

[3] See Final Order (*Application of Earnest G. Johnson, Director of the Public Utility Division, Oklahoma Corporation Commission Requesting Commission Approval of an Access Plan et al.*), Order No. 399040, dated January 3, 1996 (Order and Exhibit 106 attached as Exhibit B).

EXHIBIT "B"

6

as Exhibit C). In other words, even though the additional step of dialing "0" for an operator was neither ideal nor desired by Hinton Tel, the OCC staff appears to have still considered the 911 arrangement to be satisfactory.

Notwithstanding the OCC's response, Hinton Tel was concerned about the extra time needed on a 911 call to dial "0" and wait to be connected with a live operator. It placed notices in the local newspapers (example attached as Exhibit D) and in its customer bills (example attached as Exhibit E) reminding Caddo County customers that they could reach various police, fire and ambulance numbers more quickly by dialing them directly, and listing all of the potentially relevant first responder telephone numbers.

Hinton Tel notes that this 911 problem arose during the midst of Caddo County's implementation of E911 service. During 2012 and January-April 2013, Caddo County was remodeling its court house in its Anadarko county seat (in the southern part of Caddo County, well outside Hinton Tel's service area) to (among other things) include a County 911 call center, and was naming streets and county roads throughout the entire county and assigning specific addresses in preparation for E911 service. On January 7, 2013, Hinton Tel received a call from Caddo County indicating that it was ready to order E911 trunks into Hinton Tel's switch. Hinton Tel promptly tried to order the necessary trunks from AT&T the next day, but was told that the County's E911 database had to be much further along before AT&T would start putting in trunks (See Emails to and from Garry Findley of Hinton Tel and Katherine Gouker of AT&T attached as Exhibit F). Hinton Tel also acted promptly on January 18, 2013, to provide its Caddo County customer telephone numbers to Geocomm, Caddo County's contractor, so that the addresses for the numbers could be confirmed and placed in the County's E911 database. On May 1, 2013, Caddo County announced that its 911 call center was open, but that it could not go live with

EXHIBIT "B"

7

E911 service until 96 percent of the County's telephone numbers were matched with the accurate addresses (Exhibit G). This announcement gave Hinton Tel reason to hope that E911 service could be implemented within its northern Caddo County service areas within a few months. However, the E911 database proceeded slowly and Hinton Tel was not allowed to order trunks until November 2014. E911 service was turned up for Hinton Tel's Caddo County service areas on December 9, 2013.

Hinton Tel further notes that the 911 problem posed yet a further substantial complication because Hinton Tel was in May 2013 (and remains today) in the process of converting its switching system from a traditional time division multiplexing ("TDM") circuit switch to an Internet Protocol ("IP") capable softswitch. When Hinton Tel was first implementing 911 service in 2002, it used a Stromberg Carlson DCO switch. In 2004, Hinton Tel replaced that switch with a Siemens Electronic World Switch Digital ("EWSD"), which involved much more complex number translations. With the EWSD switch, the 911 call path route had to use direct trunk access only (i.e., Basic 911 trunks, E911 trunks, Interexchange Carrier ("IXC") trunks, Operator trunks, or 800 trunks) to get from the switch to a PSAP, 911 call center or other public safety entity. The EWSD number translations for 911 service blocked Hinton Tel's ability to go back to a normalized 10-digit number for the Caddo County 911 call center or any other location without removing all of the 911 translations and rebuilding them. Such a removal and rebuilding process would have disrupted 911 and E911 service in not only Caddo County, but also the other counties served by Hinton Tel, while it was being carried out, tested and de-bugged.

Hinton Tel's EWSD switch is a Class 4 access tandem with integrated Class 5 switching functionality that is the host switch for five remote switching devices. In 2012 and early 2013, Hinton Tel purchased and installed a Metaswitch softswitch to supplement and eventually

8

replace the Siemens EWSD switch. As of May 2013, Hinton Tel was still in the very early stages of the process of changing its rural customers over from the EWSD switch to the Metaswitch, and still has converted only about half of its customers from the EWSD switch to the Metaswitch as of the end of August 2014.

On May 20, 2013, Caddo County's 911 Director asked that 911 calls be forwarded to the new Caddo County 911 call center's local telephone number and offered to pay the long distance charges. Hinton Tel responded that this might work if the County obtained an 800 number so that 800 trunks could be used to route calls from the EWSD switch to Caddo County 911 call center. However, as long as the 911 call center kept its local telephone number, the proposal could not be implemented because the number translation changes that would be needed to sort out Caddo County's 911 calls through the EWSD switch would jeopardize the E911 services that had already been implemented in the portions of the other counties that it served (Emails to and from Garry Findley and Debbie (Brown) Davis, dated May 20 and 21, 2013, attached as Exhibit H).

Meanwhile, Hinton Tel was busy considering and analyzing potential temporary solutions to simplify and speed up responses to Caddo County 911 calls. The three primary potential solutions were:

a.  **Workaround Alternative No. 1**: All 911 calls would be routed to a single interexchange carrier ("IXC") so that when customers dialed 911, the tandem switch would utilize digit substitution to the 10-digit number for Caddo County's offices and calls would be routed via the single IXC. **Problem**: This routing potentially violated federal and state equal access requirements as it could route selected long distance calls to a carrier that was different from the customer's presubscribed IXC and would make it appear that Hinton Tel had "slammed" the customer.

b.  **Workaround Alternative No. 2**: Hinton Tel could "hair-pin" an outgoing multi-frequency trunk to an incoming trunk to loop the call back to its EWSD switch and set up call forwarding to the 10-digit number for Caddo County's offices. **Problem**: Calls would have poor voice quality that could impair the call taker's ability to

EXHIBIT "B"

9

understand the emergency message, and all calls would be sent to Caddo County with a single caller ID.

c. **Workaround Alternative No. 3**: Use a digit add feature in Hinton Tel's EWSD switch to put the 10-digit number for the Caddo County 911 call center in front of the 911 and force it into Hinton Tel's Metaswitch access tandem as a 13-digit number. The Metaswitch would use only the first 10 digits for translating the call and connect it to Southwestern Bell Feature Group C long distance trunks for delivery to the Caddo County 911 call center. This workaround avoided the translation problems of the EWSD switch by forcing through the Metaswitch calls from the substantial majority of Hinton Tel customers still served by the EWSD switch as well as those that had already been changed over to the Metaswitch. **Problem**: This solution would create phantom traffic where caller billing information is stripped away and the call is transported over a non-standard access path.

In each case, it was determined that the potential solution was fraught with issues that made no solution ideal.

On Thursday, August 1, 2013, Hinton Tel received a telephone call from Timothy May of the Commission. Mr. May stated that the Commission had received a complaint from Caddo County, that the AT&T operator path was not acceptable for basic 911 service, and that Hinton Tel must do whatever it takes to get 911 calls directly to Caddo County at their requested telephone number until E911 service was established. On Monday, August 5, 2013 (two business days later), Hinton Tel implemented the foregoing Workaround Alternative 3 as the least bad of the three alternatives that it had been considering and developing.

A fair review of the foregoing facts demonstrates that Hinton Tel exercised "reasonable judgment" in its response to AT&T's precipitous and unannounced termination of its live operator service, and that Hinton Tel has never disregarded the lives, safety and property of any of its customers, including those in Caddo County. Hinton Tel directed its Caddo County 911 calls to the live AT&T operators in Oklahoma City in 2002 only after it was unable to convince its local Town of Hinton Police Department and the Caddo County Sheriff's Office to accept 911 calls. This alternative worked without complaint or incident for almost eleven years, until

EXHIBIT "B"

10

AT&T switched to an automated operator service without giving Hinton Tel any notice or advance warning. At the time that Hinton Tel learned of the AT&T change on May 6, 2013, it had already been working diligently with Caddo County, the County's database contractor Geocomm, and AT&T to implement the County's E911 service.  Hinton Tel immediately discussed the AT&T change with the OCC staff, and was heartened by the response that "it was not doing anything wrong" with respect to its 911 service.  Nonetheless, Hinton Tel expeditiously advised its Caddo County customers in newspaper notices and bill inserts that they could reach local police, fire and ambulance services more rapidly by dialing their direct numbers rather than 911, and listed all of the relevant agency numbers.  Whereas Hinton Tel did not implement the Caddo County 911 Director's proposed "fix" because it would have required complex and risky translation changes in its EWSD switch that would have disrupted and impaired the E911 service of its customers in other counties, it proceeded to develop and analyze various potential workarounds to bridge the gap until Caddo County's pending E911 service was implemented.  Whereas all of these alternatives posed technical or legal problems, Hinton Tel was able to implement the least worst of them (Workaround Alternative No. 3) within four days (two business days) after it was ordered to act by the Commission.  The fact that Hinton Tel was able to respond to the FCC's August 1 so rapidly is a testament to the fact that Hinton Tel had acted responsibly by developing and testing various alternatives so that the initial leg-work was already completed when the FCC mandated action.

The *NALF* lists different options that the Commission believes Hinton Tel should have considered.  For example, the Commission asserts that Hinton Tel made no effort to obtain an appropriate alternative local emergency authority to route 911 emergency calls or even contact local authorities such as the Caddo County Sheriff's Office in order to determine whether it

EXHIBIT "B"

11

would accept the temporary routing of 911 calls. However, Hinton Tel had spent a lot of time and effort negotiating with the Caddo County Sheriff's Office during 2002, and did not believe that its staffing and resource situations had changed sufficiently to warrant a different outcome. More important, the Caddo County 911 call center was already open as of May 1, 2012, and Caddo County's 911 Director did not request that 911 calls be sent to the Sheriff's Office. Additionally, the FCC claims that Hinton Tel should have requested that AT&T either reactivate its live operator services or modify its recorded message. However, after AT&T had discontinued its live operator service without a word of notice or advance warning to it, Hinton Tel had no reason to believe that AT&T would reverse or modify this action at Hinton Tel's request and focused upon more likely potential solutions. That a carrier did not think of, or act upon, every conceivable alternative should not be determinative as to whether it exercised "reasonable judgment." [4]

### *A $100,000 Forfeiture Will Have an Adverse Impact on Hinton Tel's Ability to Construct and Deploy Broadband Service*

Penalties and forfeitures are not favored by the law, and should be enforced only when they are within both the spirit and letter of the law. *United States v. One Ford Coach*, 307 U.S. 219, 226 (1939). In determining whether penalties and fines are excessive, courts have examined whether they are "so disproportionate to the offense as to shock public sentiment" or "contrary to the judgment of reasonable people concerning what is proper under the circumstances." *Hindt v. State*, 421 A.2d 1325, 1333 (Del. 1980).

---

[4] Note that administrative agencies are deemed to act reasonably in carrying out their rulemaking obligations without considering every conceivable alternative. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 535 U.S. 519 (1978)

12

Given Hinton Tel's 64-year record of compliance with the Commission's Rules, its successful provision of 911 and/or E911 services without complaint in the other four Oklahoma counties that it serves, and its reasonable and good faith efforts to serve its Caddo County customers and to provide 911 and E911 services in Caddo County under difficult circumstances, it should not be subjected to a forfeiture in this proceeding. As Commissioner Bowling recognized, Hinton Tel is devoted to its customers and did the best that it could to bring 911 and E911 services to the portion of Caddo County that it serves.

Moreover, the proposed $100,000 forfeiture will primarily harm the rural Oklahoma customers that the Commission is seeking to protect. Although Hinton Tel's gross revenues exceed the proposed $100,000 monetary forfeiture, the payment of a $100,000 or other large forfeiture will adversely impact Hinton Tel's ability to continue to make the network upgrades necessary to bring broadband services to its rural customers that are reasonable comparable in quality and price to those available in urban areas. In a time of economic uncertainty, high-cost support budget limits and declining intercarrier compensation revenues, every dollar is critical to rural telephone companies like Hinton Tel if they are to remain able to obtain and repay the loans necessary for broadband network and service upgrades. The proposed $100,000 constitutes over a quarter of Hinton Tel's operating income during Calendar Year 2012 ($394,000) and during Calendar Year 2013 ($354,000). Loss of such a substantial portion of its operating income and cash flow will punish all of Hinton Tel's Blaine, Caddo, Canadian, Custer and Washita County customers by causing it to postpone or cancel network upgrade projects that rely upon these dollars to support acceptable business plans, obtain favorable interest rates and/or pay expenses.

13

### *Conclusion*

In view of Hinton Tel's long history of regulatory compliance, its successful efforts to

bring 911 and/or E911 services to the other four Oklahoma counties that it serves, and the

reasonable efforts that it took to bring 911 and E911 services to Caddo County, it is respectfully

requested that the proposed forfeiture be cancelled or rescinded.

Respectfully submitted,
**HINTON TELEPHONE COMPANY OF
HINTON, OKLAHOMA, INC.**

By:  ·Gerard J. Duffy
Richard D. Rubino
Its Attorneys

Blooston, Mordkofsky, Dickens
Duffy & Prendergast, LLP
2120 L Street, N.W., Suite 300
Washington, DC 20037
Tel. (202) 659-0830

Dated: September 3, 2014

EXHIBIT "B"

Exhibit A



**CADDO COUNTY BOARD of COMMISSIONERS**
**BENNY BOWLING, COMMISSIONER**
**DISTRICT 1 – LOOKEBA, OKLAHOMA**
**326 WEST WICHITA – PO BOX 66**

Date: August 18, 2014

Mr. John Zeldis
Spectrum Enforcement Division, Enforcement Bureau, Room 3-A431
Federal Communications Commission
9300 East Hampton Drive
Capitol Heights, MD 20743

RE:     File No. EB-SED-13-000010169
        Hinton Telephone Company

Dear Mr. Zeldis:

I am aware that there was a complaint filed with FCC concerning the provisioning of E911 service in Caddo County here in Oklahoma and that there were some challenges for all parties involved that came up during the process.

There were frustrations for all involved in the process and there were delays in some areas of the county but working together we got the job done. Hinton Telephone Company had its challenges with the process as well but I think they did their part as well and as fast as they could considering they were trying to stay within the regulatory rules they operate under.

I know that Hinton Telephone Company is doing a good job serving their subscribers with telephone service and building broadband service to the rural areas. I believe Hinton Telephone Company wants to do whatever is best for their subscribers and I feel they did that in the provisioning of the E911 service as well.

Sincerely,

Benny Bowling, Commissioner

EXHIBIT "B"

**Exhibit B**

EXHIBIT "B"

BEFORE THE CORPORATION COMMISSION OF THE STATE OF OKLAHOMA

| | | |
|---|---|---|
| APPLICATION OF EARNEST G. JOHNSON, | ) | |
| DIRECTOR OF THE PUBLIC UTILITY | ) | |
| DIVISION, OKLAHOMA CORPORATION | ) | CAUSE NO. PUD 950000117 |
| COMMISSION REQUESTING COMMISSION | ) | |
| APPROVAL OF AN ACCESS PLAN. | ) | |
| | | |
| APPLICATION OF | ) | |
| CHEROKEE TELEPHONE COMPANY | ) | |
| FOR AN ORDER ESTABLISHING AN | ) | CAUSE NO. PUD 950000119 |
| ACCESS CHARGE PLAN IN LIEU OF | ) | |
| INTRALATA TOLL POOL. | ) | |
| | ) | ORDER NO.   **399040** |

HEARINGS:    November 6, 1995, January 10, 1996, and January 25, 1996
             Before Robert E. Goldfield, Administrative Law Judge

APPEARANCES:  John W. Gray, Senior Assistant Deputy General Counsel and
              Cece L. Wood, Assistant General Counsel, Public Utility Division.
                 Oklahoma Corporation Commission
              Rick D. Chamberlain and Mickey S. Moon, Assistant Attorneys General
                 Office of the Attorney General, State of Oklahoma
              Robert D. Allen and O. Carey Epps, Attorneys
                 AT&T Communications of the Southwest, Inc.
              Roger K. Toppins, Attorney
                 Southwestern Bell Telephone Company
              Nancy M. Thompson, Attorney
                 Sprint Communications Company, L.P.
              Ron Comingdeer, Attorney
                 Toll Pool Steering Committee and Toll Pool Administrator
              Ron Comingdeer, Attorney
                 Oklahoma Rural Telephone Coalition
              Ronald E. Stakem and Edward Cadieux, Attorneys
                 MCI Telecommunications Corporation
              William J. Bullard, Attorney
                    Chouteau Telephone Company
                    Totah Telephone Company
                    Cross Telephone Company
                    Cimarron Telephone Company
                    Pottawatomie Telephone Company
              Cody B. Waddell, Attorney
                    Alltel Oklahoma, Inc.
                    Oklahoma Alltel, Inc.
                    Oklahoma Communications Systems, Inc.
                    Mid-America Telephone Company
                    Wyandotte Telephone Company
              James C. Stroo and William D. Kolb, Attorneys
                 GTE Southwest Incorporated
              David Jacobson, Attorney
                 Cherokee Telephone Company

## FINAL ORDER

BY THE COMMISSION:

The Corporation Commission of the State of Oklahoma ("Commission") being regularly

in session and the undersigned Commissioners being present and participating, there comes on for

consideration the above referenced consolidated causes.

EXHIBIT "B"

Each of the consolidated causes raises the issue of an appropriate Access Charge Plan pursuant to directions contained in prior orders of this Commission. After proper notice given, the consolidated causes were called for hearing before the Administrative Law Judge ("ALJ") on the dates set forth above, and the causes now come on for final disposition by the Commission.

## PROCEDURAL HISTORY

On December 20, 1983, the Commission issued Order No. 250278, in General Cause No. 28309 which established the IntraLATA Toll Pool and Surcharge Pool ("Toll Pools"). Under the terms of the Order, all of the local exchange companies ("LECs") operating in Oklahoma were to pool all their revenues generated by intraLATA toll calls and by a surcharge on interLATA access. These revenues were to be distributed among the LECs according to an approved formula.

On February 14, 1985, the Commission issued Order No. 273256 in General Cause No. 28309 authorizing the redistribution of surcharge revenues on the basis of 1985 data. Further, on September 10, 1985, the Commission issued Order No. 285023 in Cause No. 28309 which replaced the interLATA surcharge on the carrier common line charge with a surcharge on interLATA access. Finally, on July 1, 1987, the Commission issued Order No. 314146 in General Cause No. 28309 which removed the surcharge on interLATA access.

On August 9, 1989, the Commission issued Order No. 340726 in Cause No. PUD 870000326, which approved a stipulation and agreement between all of the LECs and the Public Utility Division Staff. The stipulation directed that a Transition Committee be established to develop an intrastate access charge framework to replace the Toll Pools by January 1, 1992. The stipulation further provided that the access charge plan framework developed by the transition committee be unanimously agreed upon by its members. No unanimous plan was developed by the date ordered. Therefore, Southwestern Bell Telephone Company ("SWBT") filed a motion on December 23, 1991, requesting implementation of a terminating access plan. However, on February 24, 1992, the Commission issued Order No. 363447 in Cause No. PUD 870000326 ordering that the Toll Pools would continue to exist until a unanimous alternative is created and approved by the parties or until further order of the Commission.

Over the past few years, a number of challenges have been made to the Toll Pools' existence and whether the Toll Pools should continue to exist. On January 30, 1992, SWBT filed

2

EXHIBIT "B"

Cause No. PUD 920001213, which requested that a terminating access plan be established to replace the Toll Pools. Subsequently, on June 10, 1992, the Oklahoma Rural Telephone Coalition ("ORTC"), GTE Southwest Incorporated ("GTE"), Alltel Oklahoma, Inc. and Oklahoma Alltel, Inc. (collectively "Alltel") filed an Application in Cause No. PUD 920001335 requesting, if the Commission determined that the current Toll Pools should be modified, that the Commission approve ORTC's proposed Oklahoma Alternative Settlement Plan.

On January 5, 1994, the Commission initiated an inquiry under Cause No. PUD 940000051 regarding whether the Toll Pools should continue to exist in the State of Oklahoma, and solicited comments on the issues from all interested parties.

On April 19, 1994, the Commission issued Order No. 382640 approving a Joint Stipulation and Settlement Agreement ("Stipulation") that restructured the existing Toll Pools and provided that all LECs, with the exception of SWBT and GTE would remain in the Toll Pools and share applicable toll revenues. The Stipulation created the Intrastate Support Fund (ISF) which provides an amount of funding to various LECs through support payments from toll carriers and other access customers. The Stipulation also provided for the development and submission of a joint recommendation for alternative plans to the Commission no later than twelve months following implementation of the Agreement approved in Order No. 382799. The Agreement approved in Order No. 382799 allowed limited intraLATA toll competition and created the Oklahoma Telecommunications Task Force for the purpose, among other things, of developing a non-discriminatory Access Charge Plan, and for the purpose of investigating whether intraLATA equal access/pre-subscription is in the public interest and whether it should be implemented in Oklahoma. The agreements approved by Order No. 382640 and Order No. 382799 provided for certain contributions to be made to the Toll Pools in addition to other terms, as more fully set forth in those orders.

On June 30, 1995, the Staff of the Oklahoma Corporation Commission filed its application in Cause No. PUD 950000117 to allow interested parties to file their Alternative Access Plan with the Commission. On July 7, 1995, Cherokee Telephone Company ("Cherokee") filed its application in Cause No. PUD 950000119 for the approval for a non-discriminatory access plan. Those causes were subsequently consolidated which resulted in the Procedural Schedule culminating in the hearings set forth above.

3

EXHIBIT "B"

## SUMMARY OF EVIDENCE

At the time of hearing before the ALJ, it was announced that a stipulation providing for 1996 Oklahoma Access Charge Plan and Stipulation (the "Plan") had been entered into and signed by representatives of parties to these consolidated causes, i.e., the interexchange carriers ("IXCs"), the local exchange companies, the Office of the Attorney General of the State of Oklahoma ("Attorney General"), and the Staff of the Oklahoma Corporation Commission ("Staff"). The parties to the Plan entered into the Plan as their compromise proposal to resolve, among other dockets and issues, all issues raised by the two consolidated causes.

In support of the Plan, the following witnesses appeared and testified as follows:

Mr. Robert E. Stafford, Division Manager-Regulatory and Industry Relations for SWBT, testified in support of the Plan. Mr. Stafford, who has responsibility for SWBT's relations with independent LECs, including the toll settlement process, testified that the Plan was reached after many weeks of intense negotiations involving the LECs, the IXCs, Staff, and the Attorney General. Mr. Stafford described and explained all substantive provisions of the Plan. He testified that approval of the Plan by the Commission would serve the public interest because, among other benefits, upon implementation it would provide a mechanism which will minimally affect individual customers and maintain geographical, average toll rates by establishing a High Cost Support Fund ("HCF") with participation by all telecommunication providers; continue infrastructure investment incentives by all Oklahoma telecommunication providers; allow for the rapid implementation of non-discriminatory access charges, thus providing a structure to expand telecommunications competition; and eliminate the pooling of revenues thereby allowing each company to bill and keep its own revenues.

Mr. Stafford further testified that the use of the term "telecommunication providers" for the purposes of this Plan is intended to include, but not be limited to, interLATA and intraLATA toll providers, including resellers. He further testified that an implementation team has been established to work out implementation details and ensure implementation will meet the time frame established in the Plan. However, approximately six months after actual data is available after the implementation of the Plan, a retroactive and prospective recalculation will occur using actual data gathered during the time from implementation to the time of recalculation to ensure

4

EXHIBIT "B"

the proper application of the access charges and the allocation of contributions to the HCF as contemplated in the Plan. This retroactive and prospective recalculation will not affect the gross revenues received by the LECs per Section II.E and II.J of the Stipulation.

Mr. Stafford further testified that pursuant to the Plan, companies serving 15,000 or more access lines will receive interim HCF funding subject to refund and interest, as more fully set out in Paragraph J of the Plan. If refunds of the interim HCF are due, the interest applicable will be calculated pursuant to Title 17 of the Oklahoma Statutes, Section 152(b), in the same manner applicable to other interim rates subject to refund with interest. Mr. Stafford further testified that the Oklahoma Telecommunications Task Force will begin considering the issues associated with 1+/0+ intraLATA dialing parity within 120 days of a final unappealed order adopting the Plan.

Mr. Larry Schroeder, Deputy Director of the Public Utility Division of the Oklahoma Corporation, testified that the Commission Staff has participated in the settlement discussions and are signatories to the Plan. Mr. Schroeder further testified that the adoption and implementation of the Plan will be beneficial to consumers and telecommunication providers within the State of Oklahoma and recommended that the Commission approve the Plan in its entirety.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon full and fair consideration of the record of these consolidated causes and being well and fully advised in the premises, the Commission makes the following Findings of Fact and Conclusions of Law:

1.    Proper notice was given in these causes as ordered by the Commission by publication of Notice of Hearing on the Merits and by serving a copy of the Notice of Hearing on the Merits on all interexchange carriers and on all applicants who have made a request for a Certificate of Convenience and Necessity granting authority to act as resellers of long distance services in Oklahoma.

2.    The Commission has jurisdiction of these consolidated causes by virtue of the provisions of Art IX, §18 of the Oklahoma Constitution; 17 O.S. §131 et seq.; 18 O.S. §438.1 et seq.; OAC 165:5; and OAC 165:55.

3.    The Commission finds from the testimony and evidence presented in these consolidated causes that the Plan, attached hereto and made a part hereof, is a fair, reasonable,

EXHIBIT "B"

and equitable disposition of all relevant issues raised or which could have been raised in the above and titled causes, and therefore should be approved.

4.     The Commission further finds that the implementation of the Plan shall be accomplished by March 1, 1996, or 30 days following a final order of the Commission, whichever occurs later, and that an implementation team consisting of parties to these causes shall work to develop additional data as necessary to recalculate the application of access charges and determination of the HCF pursuant to the Plan. The Commission further finds this retroactive and prospective recalculation will not affect the gross revenues received by the LECs per Section II.E and II.J of the Stipulation.

5.     The Commission further finds that the Task Force shall begin considering the issues associated with 1+/0+ intraLATA presubscription within 120 days of a final unappealed order adopting the Plan.

6.     The Commission further finds that the Plan attached hereto is in the public interest and should be approved in its entirety and should be implemented pursuant to its terms.

### ORDER

IT IS THEREFORE THE ORDER OF THE CORPORATION COMMISSION OF THE STATE OF OKLAHOMA that the Plan attached hereto and made a part hereof, be and the same is hereby approved and adopted by the Commission as its disposition of the consolidated Cause Nos. PUD 950000117 and PUD 950000119, all in accordance with the Findings of Fact and Conclusions of Law contained herein, and the specific provisions of the Plan.

IT IS FURTHER THE ORDER OF THE COMMISSION that the implementation date of the Plan shall be March 1, 1996, or 30 days following a final order of the Commission, whichever occurs later, and that the parties to the Plan shall do all things necessary, including the filing of tariff changes to become effective upon the implementation date
of the Plan, after review and approval by the Director of the Public Utility Division, in

EXHIBIT "B"

accordance with the specific terms of the Plan.

CORPORATION COMMISSION OF OKLAHOMA

_____
CODY L. GRAVES, Chairman

_____
BOB ANTHONY, Vice-Chairman

_____
ED APPLE, Commissioner

DONE AND PERFORMED this _30th_ day of January, 1996.

BY ORDER OF THE COMMISSION:

_____
CHARLOTTE W. FLANAGAN, Secretary

### REPORT OF THE ADMINISTRATIVE LAW JUDGE

The foregoing Findings and Order are the Report and Recommendation of the Administrative Law Judge.

_____                    _____
Robert E. Goldfield, Administrative Law Judge                    Date January 25, 1996

7

EXHIBIT "B"

EXHIBIT

10·6

## 1996 OKLAHOMA ACCESS CHARGE
## PLAN AND STIPULATION

### Cause Nos. PUD 950000117/950000119

This Stipulation is entered into by the parties who have executed it below on or about January 24, 1996. The Stipulation sets forth a nondiscriminatory access charge plan (Plan). The signatory parties agree to submit it to the Oklahoma Corporation Commission (OCC) for approval at the hearings in Cause Nos. PUD 950000117/950000119.

**I.     Plan Objectives:**

This Plan is a competitively neutral access charge plan that has the following attributes:

A.     It is intended to provide a mechanism to expand telecommunications competition by establishing a High Cost Support Fund (HCF), with participation by all telecommunications providers;

B.     It is intended to continue infrastructure investment incentives by all Oklahoma telecommunications providers;

C.     It allows for the rapid implementation of nondiscriminatory access charges; and

D.     It eliminates the pooling of revenues and allows each company to bill and keep its revenues.

**II.     Plan Specifics:**

A.     *Implementation Date:*  March 1, 1996, or 30 days following a final order of the OCC, whichever occurs later.  Local Exchange Carriers (LECs) will bill and keep its billed revenues, including originating and terminating access, intra-company toll which does not utilize any SWBT network facilities, and billing and collection revenues.

B.     *Rates:*  All Oklahoma LECs will implement competitively neutral two-way access charges, at the same rates for intrastate interLATA and intrastate intraLATA, as follows for all non intracompany toll calls:

1.     SWBT at current intrastate switched access rates effective 12-31-95.

2.     GTE-SW at the intrastate switched access rates as approved by the OCC in PUD 940000476/940000479.

EXHIBIT "B"

3.   All other LECs (hereafter ILECs) at:

    (a)   Current intrastate switched access rates amended to include the current interstate 0- transfer rate.

    (b)   Billing and Collection (B&C) between LECs as negotiated with toll carriers.

4.   No access will be billed between companies with respect to calls transmitted pursuant to Wide Area Calling Plan (WACP) or Extended Area Service (EAS) arrangements.  This does not preclude non-LECs from taking a different position regarding this issue in WACP/EAS proceedings.

    C.   ***ILEC Declarations:*** Within 30 days of implementation of this Plan, each ILEC shall declare its intention to be either a toll provider or access provider, subject to the Oklahoma High Cost Support Fund (HCF) restrictions, as more fully described in Sections II.E and II.F below.  No ILEC shall be eligible to declare as an access provider if it has an ownership interest in a facility-based toll provider or if it provides any alternate 1+/0+ dialing plan, allowing for alternative access to intraLATA toll provision, unless there is complete structural separation between the ILEC and the facility-based toll provider and/or the provision of the alternative 1+/0+ dialing plan is through a structurally separate entity.  Beginning 12 months following implementation of this Plan, the basis of settlement between LEC toll providers shall be terminating access.  For purposes of this Plan, "complete structural separation" or "structurally separate" is defined as a separate legal entity with common employees and/or common expenses, if any, allocated pursuant to Federal Communications Commission (FCC) Rules and Regulations Part 64.  An ILEC electing to be an access provider shall remain responsible for providing toll services between its local exchange areas.[1]

    D.   ***SWBT to be toll provider:*** If the Plan is approved, SWBT will consent to become the designated and exclusive 1+/0+ intraLATA toll provider for all ILECs who elect to be access providers, for all such ILECs' non-intra-ILEC 1+/0+ toll calls.  ILECs will continue to be the toll providers for all intra-ILEC, intraLATA toll call which do not utilize any SWBT network facilities.  ILEC access providers shall not be required to impute access rates into the price of its toll services.  All existing toll provisioning involving traffic carried over SWBT's toll facilities (including existing meet-point and point-of-presence (POP) arrangements) shall remain in place as of the Implementation of this Plan, unless changes, additions, deletions, etc., affecting the routing of access/toll interconnection are mutually agreed to by the involved companies (SWBT and the ILEC).  ILECs will continue to retain control over matters other than meet-point, POP facility provisioning, i.e., control over the underlying facilities to their respective Class 4/5/Tandem offices, including all non-toll or non-access facilities and traffic involving interexchange carriers, resellers, dedicated facilities providers, and other toll providers.

---

[1] Panhandle Telephone Cooperative, Inc. and EagleNet, Inc., as access providers, will remain responsible for providing toll services between local exchange areas of their companies.

EXHIBIT "B"

E.   ***Oklahoma High Cost Support Fund (HCF):*** Upon Implementation of this Plan, an Oklahoma High Cost Support Fund (HCF) will be established to provide necessary funding required to maintain revenue requirement neutrality for those ILECs who seek HCF funding and who elect to become access providers.  The HCF will have the following attributes:

1.   Only companies serving less than 15,000 access lines (as of December 31, 1994) in Oklahoma shall be eligible for support funds from the HCF using the procedures outlined in Sections II.E.3 and II.I.  ILECs serving 15,000 or more access lines may be eligible for HCF by order of the OCC, pursuant to Section II.J.  Access lines by company as of December 31, 1994 are as listed on Attachment D .

2.   It will be a fixed-dollar fund, using 1994 finalized pool results as the initial funding level;

3.   The amount of the fund will be calculated by determining the sum of the 1994 quarterly pool revenue requirements of the ILECs who elect to become access providers, adjusted to include the full annual amount of allocated expenses and net investment[2] for telephone operating areas acquired during 1994 which have been approved by the OCC and annualization of cost based revenue requirement for ILECs who have converted to a cost based settlement method during 1994, with cost companies' revenue requirement adjusted to reflect a 10.823% rate of return on net investment, including the estimated cost of HCF administration, less the calculated revenues for each pool member company as follows:

(a)   Calculated intrastate access charges (See Section B. above);

(b)   Bill and keep WACP revenues, if the ILEC access provider operates exchange(s) within a WACP;

(c)   Bill and keep intracompany toll revenue;

(d)   Other existing pool reportable revenue(s).

4.   The HCF shall be funded on a nondiscriminatory basis by all appropriate telecommunications providers, including, but not limited to, interLATA and intraLATA toll providers, including resellers.  The amount apportioned annually to interLATA and intraLATA toll providers shall be calculated individually on the basis of the most recent twelve months of retail billed

---

[2] Net investment does not include amounts booked to telecommunications plant adjustment, Acct. 2005.  Acquisition premiums are expressly excluded from this amount.

EXHIBIT "B"

toll minutes of use (RBMOU) (including unstimulated WACP and EAS minutes of use).[3]  All minutes of use from new or expanded WACP, EAS or any other flat rate toll plan established by the OCC, at the effective date of the implementation of the WACP, EAS or any other flat rate toll plan, will be included in determining the HCF contribution share of the funding companies.

The total HCF will be allocated between intraLATA and interLATA toll in accordance with Attachment C. The HCF amount allocated  to intraLATA toll shall be apportioned to intraLATA toll providers on the basis of intraLATA toll RBMOU.  The HCF amount allocated to interLATA toll shall be apportioned to interLATA toll providers on the basis of interLATA toll RBMOU.  See Attachment C for the allocation methodology of the HCF between intraLATA toll providers and interLATA toll providers.  For the definition of RBMOU, see Attachment A.

5.    Funds shall be remitted monthly to the HCF Administrator who shall distribute funds monthly to the eligible ILEC access providers.

6.    Funds shall continue to be distributed to each ILEC access provider at the fixed dollar/computed levels, subject to the provisions of Section II.H. below.

F.    *Transitional nature of Oklahoma HCF:*  This Plan retains support from toll services, funded in a competitively neutral manner, to all qualifying ILECs. It is recognized that such a distribution of funds is acceptable and necessary in order to implement a nondiscriminatory access charge plan. This Plan is not intended to establish any precedent with respect to universal service support issues which will arise with the advent of local competition. It is recognized by the Plan proponents that in connection with the implementation of switched local competition, the Oklahoma HCF, as described above, and the distribution criteria established in this Plan may be revised, after notice, hearing and review by the OCC. Except for the provisions of this Section, all signatory parties agree not to take any actions that would seek to revise, change or alter the provisions of the Plan for a minimum of two years from the implementation of this Plan without good cause shown. Any actions taken to seek to revise, change or alter the provisions of the plan shall be with notice and hearing and shall be effective only after order of the OCC.

G.    *GTE HCF support:*  GTE may collect $1,823,655 from the HCF without making an additional showing beyond the evidence submitted to PUD 940000476/940000479.  If GTE seeks

---

[3] The unstimulated WACP/EAS MOU are those toll MOU that were displaced with the implementation of the existing plans for Oklahoma City, Lawton, Tulsa and Enid WACPs and Salina-Pryor EAS.

EXHIBIT "B"

HCF in excess of $1,823,655 and/or for more than two years, GTE must make an additional showing of need consistent with the procedures for LECs serving over 15,000 subscribers. Any new HCF funding obligation will be recovered through adjustments in GTE's toll or Per Minute of Use Charge ("PMOUC") rates as outlined in II.N.

H.   ***ILEC options:*** Beginning January 1, 1997, or one year subsequent to the Implementation of this Plan, whichever occurs later, any ILEC may elect as follows:

1.   To no longer receive HCF support funding and become a toll provider for all inter- and intra-company toll calls for all its respective exchanges and thereby: (a) discontinue receipt of any and all HCF support payments; (b) bill and keep all respective toll revenue; and (c) enter into terminating access settlement arrangements with all other toll providers;

2.   To request changes to its HCF funding support level under the terms and conditions set forth in Section I. below.

3.   To petition the OCC and seek any other lawful relief. Said petition shall be mailed to each party to this Cause.

I.   ***Procedures for funding changes for ILECs serving fewer than 15,000 access lines:*** The following terms and conditions will apply to any requests by ILEC access providers who qualify for support from the HCF and who request a change in the amount of funding received from the HCF:

1.   Before receiving additional support from the HCF, an applying company must demonstrate that it has local service residential access line rates (including any applicable WACP or EAS additives) which are at least at parity to similar size calling scopes of SWBT. If they are not, an appropriate offset to the applying company's revenue requirement will be made (number of lines x rate differential x 12 - as a reduction amount to the filed requirement). This rate additive shall be used as an offset in future determinations of HCF funding requirements for the applying company. This offset procedure shall be used in future determinations of HCF funding requirements for the applying company, based on the number of lines and the rate differential for the test year used in such a filing.

2.   ILECs serving less than 15,000 access lines may select, on a one-time basis, one of the following methods of computation:

(a)   ***Access only basis:*** Any earnings shortfall must be demonstrated based on costs assigned to interLATA and intraLATA access will be determined by FCC Parts 32, 64 and 36, at 10.823% return on intrastate toll investment (ROI), as modified by a phase-down of the

-5-

EXHIBIT "B"

intrastate Non-Traffic Sensitive allocation to a state gross allocator of 23.46%, using a three-year phase down schedule, beginning on the implementation date of this Plan, subject to a maximum 5% change per year. Average schedule ILECs requiring additional HCF may utilize average schedule settlement formulas in effect in 1994. For those companies phasing down the gross allocator at 5% per year, the phase down will continue until it reaches 23.46%. Any applicant shall have the right to present evidence seeking a waiver from the phase down described in this subparagraph.

(b) *Total intrastate company basis:* Any earnings shortfall must be demonstrated based on total intrastate company operations (inclusive of the interstate Universal Service Fund) using a target 12.2% return on equity (ROE). The equity portion will be calculated by subtracting total allocated intrastate telephone company debt (i.e., debt associated with telephone company operations is allocated to intrastate based on the allocation of telephone company net investment) from the intrastate telephone company net investment of the ILEC. An individual company ROE will be used if ordered by the OCC after August 1, 1995. If an individual company ROE is used, the underlying ordered capital structure methodology used to determine that company's ROE will also be used for that company. However, if an applying company is an Average Schedule Company for its interstate operations, then its ROE will be determined on a total telephone company basis (interstate plus intrastate). Any applicant shall have the right to present evidence seeking waiver from the method of calculating equity and the return on equity as described in this subparagraph.

3. An application for a change in funding pursuant to Section I.2(a) or (b) shall be made on forms, shown as Attachment B hereto, to be approved by the OCC and shall be based upon calendar fiscal year results of operations, with reconciliation to the requesting company's OCC Annual Report, and shall be accompanied by a copy of the company's independent auditor's report.

4. An applying company's percentage increase, as computed in Sections I.2(a) or I.2(b), in HCF funding shall be no greater than the percentage increase in that company's net total Oklahoma message loops (but no less than the applying company's number of loops as of the implementation of this Plan) as defined in Part 36.611(a)(8) of the FCC's Part 36 rule, plus private line loops, unless the requested increase is due to:

(a) increases in the applying company's intrastate cost of operations due to the specific requirements of federal or state regulatory orders; or

EXHIBIT "B"

     (b)    emergencies such as fires, floods, tornados and other Acts of God; or

     (c)    catastrophic access line or revenue loss; or

     (d)    increases in the applying company's intrastate cost of operations due to the specific requirements of federal or state legislation.

5.    In any case set forth in Section I.2, the applying company must establish, by substantial evidence, demonstrated by the Application in Section I.3, its needs for increased funding. A request for support above that provided via the loop increase in Section I.4, pursuant to Sections I.4(a), (b), (c) or (d) shall be governed by the OCC's rules relating to requests for general rate increases as expedited through the filing of the forms and procedures as provided for in Section I.3 and Attachment B, attached hereto.

6.    All parties to a proceeding wherein an ILEC access provider applies for a change in its HCF funding shall have the right to review the application, its exhibits and attachments (subject to appropriate confidentiality agreements). If the filing is made pursuant to Sections I.3 or I.4, the parties may intervene and contest such filing. The provisions of 51 O.S. § 24A.22 shall apply if a party seeks protective relief in any proceeding brought pursuant to this docket before the OCC.

    J.    ***ILECs serving 15,000 or more access lines:*** ILECs serving 15,000 or more access lines will receive interim HCF funding. The actual revenue[4] received from the toll pool for the most recent four quarters (preliminary 3rd quarter 1995, final first and second quarter 1995 and final fourth quarter 1994) will be the basis for the HCF calculation. From the sum of the revenue for these four quarters, the revenue described in E.3.(a), (b), (c), (d) will be deducted to calculate the interim HCF. If all or any portion of the interim HCF funding is not made permanent, the portion which is not made permanent shall be subject to refund and interest pursuant to law and the rules of the OCC.

    Within 6 months of a final unappealed order approving this Stipulation in this Cause, ILECs subject to this paragraph will file an application seeking to remove the interim status and refund obligation of its HCF interim funding. Simultaneous with filing the application the company shall submit the forms attached hereto as Attachment B and Attachment E. The OCC Staff shall conduct a desk audit of the forms filed by the applicant and may pursue reasonable additional discovery necessary to determine if the interim HCF funding is in accordance with the provisions of this Stipulation and is fair and reasonable. Other interested parties may participate in this determination. If the interim HCF funding (as may be amended by the applicant) has not been made

---

[4] Actual revenues are deemed to be as reported as "settlement excluding AFUDC," Column G of Oklahoma Intrastate Pool Form 102F.

EXHIBIT "B"

permanent within twelve months following the final, unappealed order in this Cause, the interim funding shall cease and be subject to refund with interest unless the Notice of Intent to file a general rate change is filed by the applicant within the twelve month period. A general rate change filing by the ILECs subject to this paragraph shall be governed by law and the OCC's rules relating to requests for general rate increases and shall be based upon twelve months' results of operations, with reconciliation to the requesting company's OCC Annual Report. The application shall be accompanied by a copy of the company's independent auditor's report. At the hearing, the applying company must establish its needs for initial or increased funding by substantial evidence. All parties to this proceeding shall have the right to review the application and may intervene and contest or support such filing. Protective relief may be sought pursuant to 51 O.S. § 24 A.22. Before receiving any additional support from the HCF on or after January 1, 1997, or one year after the implementation date of the plan, whichever occurs later, an applying company must demonstrate that it has local service residential access line rates (including any applicable WACP or EAS additives) which are at least at parity to similar size calling scopes of SWBT. If they are not, an appropriate offset to the applying company's revenue requirement will be made (number of lines x rate differential x 12–as a reduction amount to the filed requirements). This offset procedure shall be used in future determinations of HCF funding requirements for the applying company based on the number of lines and the rate differential for the test year used in such a filing.

K.     *1+/0+ intraLATA presubscription:* Any implementation of 1+/0+ intraLATA dialing parity is deferred to the Oklahoma Telecommunications Task Force, pursuant to the Amended Joint Stipulation approved in Cause No. PUD 890001159, Order No. 382799. The Task Force will begin considering the issues associated with 1+/0+ intraLATA dialing parity within 120 days of a final unappealed order adopting this Stipulation.

L.     *HCF Administration:* The HCF shall be administered by a neutral third party. Initial staffing may be by SWBT personnel, who currently administer the toll pools, subject to budgetary and operation review by an HCF Administration Board, similar in makeup to the existing Toll Pool Steering Committee, including representatives from the OCC and payors. The HCF Administrator shall review requests for payments from the HCF for compliance with disbursement rules and shall establish the annual HCF funding requirement of each regulated telecommunications provider and recommend disbursement findings and assessment findings to the OCC for review and approval.

M.     *Operator Services:* For any ILECs providing operator services under contract, and incurring operator expenses for SWBT-ILEC traffic, the ILECs shall retain the operator service additives on all SWBT-ILEC traffic. If 0- intraLATA inter-company toll calls handled by the ILEC access provider are transferred to the toll provider, they shall be transferred at the rates which are the same as the Company's interstate transfer rate for the transfer service.

N.     *Toll Providers' Revenue Distribution:* Toll providers' net settlement changes, at implementation of the Stipulation and changes that occur thereafter, will be recovered through adjustments in the toll providers' toll or PMOUC rates.

-8-

EXHIBIT "B"

O.   **Support Funding Adjustments:**  All provisions in PUD 1159 and 1213/1335 that relate to the establishment of the Intrastate Support Fund (ISF), any fixed payments, and the associated funding mechanisms, except for the provisions associated with the Per Minute Of Use Charge (PMOUC), as provided for in Section N, will be replaced by the provisions of this Agreement.

P.   **Termination:**  This Plan shall terminate upon order of the OCC, after hearing.

Q.   **Entire agreement:**  Signatories to this Stipulation agree that if this Stipulation is not adopted by the OCC in its entirety, then the Stipulation is null and void.

The following parties support the adoption of this Stipulation by the OCC:

Public Utility Division
Oklahoma Corporation Commission

Attorney General of Oklahoma

Southwestern Bell Telephone Company

GTE Southwest Incorporated

AT&T Communications of the
Southwest, Inc.

MCI Telecommunications Corporation

Sprint Communications Co., L.P.

Alltel Oklahoma, Inc. and Oklahoma
Alltel, Inc.

-9-

EXHIBIT "B"

Chouteau Telephone Company
Totah Telephone Company
Pottawatomie Telephone Company
Cross Telephone Company
Cimarron Telephone Company

Cherokee Telephone Company

Oklahoma Rural Telephone Coalition
  Atlas Telephone Company
  Beggs Telephone Company
  Bixby Telephone Company, Inc.
  Canadian Valley Telephone Company
  Carnegie Telephone Company
  Central Oklahoma Telephone Company
  Chickasaw Telephone Company
  Dobson Telephone Company
  EagleNet, Inc.
  Grand Telephone Company
  Hinton Telephone Company
  KanOkla Telephone Association
  Lavaca Telephone Company
  McLoud Telephone Company
  Medicine Park Telephone Company
  Oklahoma Telephone & Telegraph
  Oklahoma Western Telephone Company
  Panhandle Telephone Cooperative, Inc.
  Pine Telephone Company
  Pioneer Telephone Cooperative, Inc.
  Salina-Spavinaw Telephone Company
  Santa Rosa Telephone Cooperative, Inc.
  Shidler Telephone Company
  South Central Telephone Association
  Southwest Oklahoma Telephone Company
  Terral Telephone Company
  Valliant Telephone Company

Oklahoma Communications Systems,
Inc.; Mid-America Telephone Co. and
Wyandotte Telephone Co.

-10-

EXHIBIT "B"

PUD 950000117
Attachment A

Definition of "Retail Billed Minutes of Use (RBMOU):

"Retail Billed Minutes of Use (RBMOU)" means any billed or billable minutes of use (MOU) provided by any telecommunications company providing service originating or terminating in the state of Oklahoma to any customer of that company. RBMOU shall exclude those dedicated point-to-point services not capable of being switched in the local exchange carrier's (LEC's) public switched network (i.e., point-to-point services refer to services provided between end user premises without entering the LEC's public switched network). An intrastate billed MOU shall consist of a minute, as above-defined, for any call which originates and terminates within the state of Oklahoma. Calls which originate or terminate on an interexchange carrier's (IXC's), or LEC's network using special access or private access services shall be included in determining the RBMOU.

If a service is sold which allows a certain block of minutes for a fixed price, the actual minutes used, instead of the minutes allowed, shall be reported.

A carrier's MOU transmitted over facilities which are purchased or leased from another carrier for resale shall also be included in the reported RBMOU. If such facilities are leased on a usage-sensitive basis, they may also qualify as resold MOU, provided the carrier reselling the minutes provides sufficient evidence that the selling carrier is paying the appropriate support payments. If the carrier reselling the minutes pays terminating switched access charges, or the facilities leased are not usage sensitive, the MOU do not qualify as resold minutes (i.e., the lessee is providing his own facility and is not "reselling" the minutes). Any carrier which purchases Feature Group Access Service from a LEC, whether for its own use or for resale, shall include the Feature Group Access MOU as part of that party's RBMOU.

Any carrier which switches or provides operator services from outside the state of Oklahoma, by using an interstate service to transmit the call to the out-of-state switching or operator service point and an interstate service to transmit the call back into the state of Oklahoma, shall include such RBMOU in its intrastate MOU report, where the end user call was intended to originate and terminate in the state of Oklahoma, as based on the perspective of the end user. Such minutes should be identified to the selling carrier so that the selling carrier does not pay interstate CCL charges.

EXHIBIT "B"

PUD 950000117/950000119
STIPULATION - ATTACHMENT B
PAGE 1 OF 15

## Simplified HCF Funding Modification Filing Method/Forms

A simplified filing procedure to modify a Local Exchange Company (LEC) Access Provider's High Cost Fund (HCF) funding will be implemented effective January 1, 1997, or one year subsequent to implementation of the Access Plan. The following represents a general explanation of these procedures and filing requirements, including the proposed forms to be filed in support of the filing and its associated revenue requirement; if such request for HCF support is filed by any LEC access-provider[1]. The filing is to be based upon the LEC access providers' allocated intrastate telephone operations, or total company operations for Average Schedule Companies; utilizing its historic: net investment, expenses and revenues, based upon FCC Part 32, 36 and 64 Rules, as modified by Oklahoma Pool procedures.[2]

### General Description:

This simplified HCF support procedure is available to all LEC access provider companies. The filing is intended to address revisions to a company's initial HCF calculation, through the review and adjustment of intrastate intraLATA/interLATA revenue requirements of the individual local exchange access provider company. This filing process will not be used as a general rate case nor is it designed to make or propose changes in basic local exchange rates, or to adjust rates other than that affecting the companies' HCF.

---

[1]See filed plan for specifics not fully referenced/discussed herein

[2] See form specifics for differences in request based on "access only" versus "total. company intrastate operations".

EXHIBIT "B"

Filings must be made on behalf of individual local exchange telephone companies, and not by multiple or aggregated telephone companies.

Failure to file or make application, in the prescribed format will result in denial of the Application; and thus the 90/120-day time frames (as delineated later) are not initiated unless a filing is in compliance with the prescribed format and contains all required supporting documentation. Applications will not be held open or continue to be carried on the Commission's calendar subject to a company "completing" or "updating" its filing to comply with the prescribed filing format/information.

**Filing Requirements:**

1) The Commission must receive written notice of the Intent to File an Application at least 30 days in advance of the Application filing.

2) The Commission will make its approval/determination of the filing within either: 90 days of the filing if the loop growth test is met; or within 120 days of the filing, if the loop growth test is exceeded, unless this period is extended for good cause (e.g.: as a result of intervention/discovery process by any party similar to procedures embodied in OCC general rate case rules).

3) There is no restriction on the dates by which Applications can be submitted to the Commission, but historic test periods will be only calendar-year basis (unless the company's fiscal year is on a different basis).

4) Existing statutes or filing requirements guiding the procedures to be used in making an Application with the Commission are not altered or waived by this procedure. This specific filing/approval procedure applies only to filing for access-related HCF, or intrastate total

EXHIBIT "B"

company HCF requirements.

**Filing Format:**

1)  The company must file using the attached forms, which support the company's revenue requirements - by intrastate jurisdiction for cost companies or by total company for Average Schedule companies - either based on access only, or total company intrastate; and will include the attached summary revenue requirement format, and supporting documentation. The total of all jurisdictional components must be reconciled to the actual book amounts by explaining any differences or adjustments between the filing and the company's "subject to separations" books ("study adjustments"). An independent auditor report shall also accompany the filing request, and shall also be reconciled to filing computations. Such reconciliations shall include total company per-book to "subject to separations" amounts (Part 64, etc.).

2)  The filing should incorporate the most recent actual twelve months data, and shall not include projected or forecasted rate base or expense components in the revenue requirements; or any other proforma adjustments.

3)  Only the intrastate jurisdictional revenue requirements (either access only or intrastate total company) are subject to review, or revision, in this proceeding. These computations shall generally follow existing requirements of the Oklahoma Intrastate Toll Pool (see 6. following).

4)  The rate of return to be used in the simplified HCF filing will be either:  A) if filed as "access only": Return on Investment at (ROI) at 10.823 percent;  B) if filed "intrastate total company": Rate of Return utilizing an equity component return of 12.2 percent/actual debt

EXHIBIT "B"

cost; or an individual company specific ROE will be used if such ROE is ordered after August 1, 1995. (In filings utilizing equity/debt components, the equity portion shall be calculated by subtracting total allocated intrastate debt from total allocated intrastate net investment of the LEC. However, if the LEC is Average Schedule and applying for total company intrastate, the equity portion shall be calculated on total company basis.)

5) Weighted DEM is to be capped at 85.00 percent to toll. A three year phase-down (beginning 1/1/96) of NTS loop costs to the state composite 23.46 percent (with a 5 percent per year maximum decrease) shall be included in the filing. The phase-down shall continue beyond the three years if necessary to accomplish the ultimate 23.46%.

6) Adjustments and level of review:

a) The intent of any future HCF revision request is that the filing will not incorporate, or include, rate case type adjustments by the filing company (e.g.: normalization of prior period, etc.), nor focus on proposed rate case type adjustments by intervenors or Staff. Proposed issues, or adjustments, will only focus on compliance issues such as: FCC Part 32, Part 36 (as modified under existing Oklahoma Pool procedures), Part 64, Generally Accepted Accounting Principles (GAAP) and any applicable Oklahoma Corporation Commission orders. Changes to depreciation rates shall generally not be permitted, nor is it contemplated that similar such adjustments will be included in filings.

Rate case type adjustments will not be permitted, to the extent that Applications are to be based on a test period representative of historical investment, expenses and revenue. Further, the intent is not to abuse the process by the filing of an Application that takes advantage of a nonrecurring or extraordinary circumstance, which does not

EXHIBIT "B"

represent a reasonable recurring revenue requirement.

b) The filing may, at the company's discretion, include a request for the HCF amount greater than that amount passing the "loop growth increase test". (This may be required due to specific other listed circumstances - see filed Access Plan). However, for the filing to be considered complete, and in compliance with filing requirements, all requested amounts in excess of the loop-growth test amount must be separately identified. Include supporting calculations and workpapers, including a narrative explanation of each proposed adjustment; and provide the total adjustment multiplied by the specific separations factor to arrive at the jurisdictional adjustment (by account number).

Generally, it can be expected that when/if company filed rate adjustments exceed the loop growth test, this will prompt intervenors, and Staff, to a more extensive review of the filing amounts and therefore the full 120 day period may be utilized for this review/intervention.

The reviews contemplated in this process are expected to generally follow the information review presently performed by the Pool Administrator Staff. Reviews will encompass both mathematical accuracy and demonstrated compliance to Part 36 (as modified under existing Pool procedures, and in compliance with existing Pool review procedures). Discovery shall not be either arbitrarily limited, or extended, to issues not in contention in the HCF/access process. While the OCC Staff shall be the prime reviewer, intervenors may, with appropriate proprietary agreements, be granted full review capability.

The attached forms, or those in compliance with the included information/format, will be filed to support any HCF/access filing. The intent of the forms is to allow a complete filing review, absent the initial need for supplemental, or clarifying, data. No expressed limitation shall be imposed however to the discovery process/data review.

Attached are the following forms:

A.    Simplified Filing/HCF Modification Calculation

B.    Revenue Requirement Calculation, including Taxes

C.    Book to "Subject to Separations" Adjustment(s)

D.    Study Adjustment Detail(s)

EXHIBIT "B"

## SIMPLIFIED FILING/HCF MODIFICATION CALCULATION*

| I | REVENUE REQUIREMENT | |
|---|---|---|
| | Access Only (A) | $ _____ |
| | Intrastate Total Company Option (B) | |
| II | LOCAL LINE RATE PARITY ADJ (IF REQ'D) | _____ |
| III | ACCESS REVENUE (TEST PERIOD) | _____ |
| IV | WACP/EAS ADDITIVE REVENUE (IF APPLICABLE) | _____ |
| V | BILL/KEEP INTRACOMPANY TOLL REVENUE | _____ |
| VI | OTHER REPORTABLE REVENUE (C) | _____ |
| VII | LOCAL SERVICE AND OTHER INTRASTATE REVENUE (D) | _____ |
| VIII | MODIFIED HIGH COST FUND REQUIREMENT (I minus II-VII) | _____ |
| IX | CURRENT HIGH COST FUND REQUIREMENT | _____ |
| X | PERCENTAGE HCF REQUEST INCREASE (VIII-IX) | _____ |
| XI | LOOP COUNT (PERIOD EQUAL TO X) | _____ |
| XII | TEST PERIOD LOOP COUNT | $ _____ |

(A)   Attachment I - Columns B-E, Ln 10
(B)   Attachment I - Columns B-H, Ln 10
(C)   See Toll Pool procedures for revenue reporting; if request is on a total Intrastate company basis, include Interstate USF receipts
(D)   If request is based on "total intrastate operations", option I, B above


*ATTACH SUPPORTING DETAIL FOR LINES II - XII

EXHIBIT "B"

Exhibit C

## Garry Findley

| | |
|---|---|
| **From:** | "Kenneth Doughty" <ken1tel@hintonet.net> |
| **Date:** | Tuesday, May 07, 2013 4:52 PM |
| **To:** | <garryfindley@hintonet.net> |
| **Subject:** | FW: Hinton Phone Co Not Complying with FCC |

**From:** Ron Comingdeer [mailto:hunter@comingdeerlaw.com]
**Sent:** Tuesday, May 07, 2013 4:33 PM
**To:** Ken Doughty
**Cc:** Kendall Parrish
**Subject:** FW: Hinton Phone Co Not Complying with FCC

Ken, below is the email we discussed. I also spoke with Jim Jones with the Commission and he had spoken with Debbie and with Garry Findley and seemed comfortable that Hinton has not done anything wrong and in fact was providing 911 but was not providing E911 yet due to Caddo County not having everything in place.

I will let you know if I hear anything else.

Thanks Ron

Ron Comingdeer
Ron Comingdeer & Associates, P.C.
An Association of Professional Corporations
6011 N. Robinson, Ave.
Oklahoma City, Oklahoma 73118
phone 405-848-5534
fax 405-843-5688

This e-mail message is CONFIDENTIAL and intended only for the named recipient(s) above. DO NOT FORWARD this message without approval from Ron Comingdeer, Attorney at Law, 405-848-5534, 6011 N. Robinson Ave, Oklahoma City, Oklahoma 73118. This message may contain information that is privileged, attorney work product or exempt from disclosure under applicable law. If you have received this message in error, or are not the named recipient (s), please immediately notify me and delete this e-mail message from your computer.

**From:** Maribeth Snapp [mailto:M.Snapp@occemail.com]
**Sent:** Tuesday, May 07, 2013 2:03 PM
**To:** Ron Comingdeer; Kendall Parrish
**Cc:** Jim Jones
**Subject:** Fwd: Hinton Phone Co Not Complying with FCC

Is Hinton telephone company one of your clients?

Maribeth
Sent from my iPhone

Begin forwarded message:

> **From:** Debbie Brown <caddoe911@att.net>
> **Date:** May 7, 2013, 1:37:37 PM CDT
> **To:** Maribeth Snapp <M.Snapp@occemail.com>
> **Subject: Hinton Phone Co Not Complying with FCC**

5/13/2013

EXHIBIT "B"

**Exhibit D**

EXHIBIT "B"



**Eakly Flowers & Gifts**

*Let us help you shop for*
**Mother's's Day**

*Jewelry, Purses, Fingertip Towels, Home Decor and More*
**Main Street, Eakly**
405-797-3379

forgets his roots.

"Thank You" for what he/she does for you.

ocial media!
ttle League
at the park
or the Tour-
oming up.
who helped.
had open
Oklahoma
riday and is
igh there are
h his heart
r was to be

ig lifted for
Phifer, who
as. Russ has
for a while,
continues to
nany friends
cheering him
l artist.
s recovering
ice a valve in
air an aneu-

y to Alicen
l baby sister.
ó to Ashley

ny grandchil-
KC recently,
sters, Ashley
ch, then did

sary to Keith
han.
learn of the
er School Su-
ill Dilks of
ate wife were
ool and com-
stay here, for

timer" Binger
ack-burn Rich



**Agent - Jessy Barger**
*Weatherford Insurance*

113 N  Bradley Weatherford, OK 73096
Phone: 580.772.8600
Cell: 580.330.2546
E-mail: agent.JBarger.0159@afrmic.com

*American*
*Farmers & Ranchers*
American Farmers & Ranchers Mutual
Insurance Company - American Farmers & Ranchers Life Insurance

Office Hours: Mon. – Fri. 9 a.m to 5 p.m.

*Offers All Lines of Business:*
Home - Farm - Auto - Mobile Homes
Cycle - Travel Trailer - Life Ins.

Call or stop by for a Quote

*In Area Newspaper
Country Connection  5-7-13*

Advertisers
who make this
paper  possible!
+
Thank You!

Sunday Worship: 11:00 a.m.
Sunday evening: Baptist Training Course 6:00 p.m.
Sunday evening: Bible Study Fellowship and Prayer 7:00 p.m.
Wednesday evening: Youth Group and Kids Club 6:30 p.m.
Wednesday evening: Adult Bible Study and Prayer 7:00 p.m.

We are located 9 miles west of Binger and 4 miles east of Eakly on highway 152. Call us at 405-797-3327 for more information.

CADDO COUNTY ENHANCED 9-1-1 SERVICE IS NOT ENABLED
AT THIS TIME FOR THE HINTON TELEPHONE COMPANY EXCHANGES
HINTON TELEPHONE CO IS WORKING WITH CADDO COUNTY 9-1-1
AND WILL SEND A NOTICE WHEN THE E-9-1-1 SERVICES ARE READY
FOR USE.
IN CASES OF EMERGENCY BELOW ARE A LIST OF NUMBERS TO CALL
*FOR A FASTER RESPONSE*

**EMERGENCY Numbers are in BOLD**          *(page 1 in telephone directory)*

|  | AMBULANCE | FIRE | POLICE |
|---|---|---|---|
| CEDAR LAKE | 542-3260 | **284-6911** | 284-6814 |
|  |  | 284-6933 |  |
| COLONY | 580-772-5958 | **929-7611** |  |
|  |  | 929-7671 |  |
| EAKLY | 580-772-5958 | **797-3335** |  |
|  |  | 797-3252 |  |
| HINTON | 542-3260 | **542-3311** | 542-3244 |
|  |  | 542-3253 |  |
| HYDRO | 580-772-5958 | **663-2222** | 663-2242 |
|  |  | 663-2531 |  |
| LOOKEBA | 542-3260 | **457-2222** | Hinton 542-3244 |
|  |  | 457-6744 | Binger 1-405-656-2426 |
| COUNTY SHERIFF |  |  |  |
| BLAINE |  |  | 1-580-623-5111 |
| CADDO |  |  | 1-405-247-6666 |
| CANADIAN |  |  | 1-405-262-3434 |
|  |  |  | 1-405-422-3187 |
| CUSTER |  |  | 1-580-323-1616 |
| WASHITA |  |  | 1-580-832-3270 |

EXHIBIT "B"

Exhibit E

EXHIBIT "B"



Account Number:
Invoice Number:

Page 6 of 6,
Jun 01 2013

CADDO COUNTY ENHANCED 9-1-1 SERVICE IS NOT ENABLED AT THIS TIME FOR THE HINTON TELEPHONE COMPANY EXCHANGES. HINTON TELEPHONE CO IS WORKING WITH CADDO COUNTY 9-1-1 AND WILL SEND A NOTICE WHEN THE E9-1-1 SERVICES ARE AVAILABLE FOR HINTON TELEPHONE COMPANY EXCHANGES TO USE.

*IN CASES OF EMERGENCY BELOW ARE A LIST OF NUMBERS TO CALL FOR FASTER RESPONSE*; ALSO FOUND ON PAGE 1 OF HTC TELEPHONE BOOK:

*EMERGENCY Numbers are in BOLD*

CEDAR LAKE:
- AMBULANCE ———————— 542-3260
- **FIRE** ———————— **284-6911**
  284-6933
- POLICE ———————— 284-6814

COLONY:
- AMBULANCE ———————— 1-580-772-5958
- **FIRE** ———————— **929-7611**
  929-7671

EAKLY:
- AMBULANCE ———————— 1-580-772-5958
- **FIRE** ———————— **797-3335**
  797-3252

HINTON:
- AMBULANCE ———————— 542-3260
- **FIRE** ———————— **542-3311**
  542-3253
- POLICE ———————— 542-3244

HYDRO
- AMBULANCE ———————— 1-580-772-5958
- **FIRE** ———————— **663-2222**
  663-2531
- POLICE ———————— 663-2242

LOOKEBA
- AMBULANCE ———————— 542-3260
- **FIRE** ———————— **457-2222**
  457-6744
- POLICE ———————— Hinton   542-3244
  Binger  1-405-656-2426

COUNTY SHERIFF:
- BLAINE ———————— 1-580-623-5111
- CADDO ———————— 1-405-247-6666
- CANADIAN ———————— 1-405-262-3434
  1-405-422-3187
- CUSTER ———————— 1-580-323-1616
- WASHITA ———————— 1-580-832-3270

Hinton Telephone Co.

EXHIBIT "B"

**Exhibit F**

EXHIBIT "B"

ATTACHMENT 2                                      Page 1 of 2

## Garry Findley

| | |
|---|---|
| **From:** | "GOUKER, KATHERINE" <kg3858@att.com> |
| **Date:** | Tuesday, January 08, 2013 3:11 PM |
| **To:** | "Garry Findley" <garryfindley@hintonet.net>; "Katherine Gouker" <katherine.gouker@att.com>; "Debbie Davis" <caddoe99@att.net> |
| **Cc:** | "Darren" <dmc@hintonet.net> |
| **Subject:** | RE: Caddo County 911 trunks to Hinton telephone Co |

Gary

I am going to try to put together a call in reference to status of database on Thursday 1:30 so we know where we are at, from what I can tell , We are a long ways off , before we start putting trunks that will be of no use to Caddo county , we need to get this database further along, I will send a meeting maker out for Thursday , Hopefully you can attend or someone to represent you .

Katherine

**From:** Garry Findley [mailto:garryfindley@hintonet.net]
**Sent:** Tuesday, January 08, 2013 2:23 PM
**To:** Katherine Gouker; Debbie Davis
**Cc:** Darren
**Subject:** Caddo County 911 trunks to Hinton telephone Co

Katherine,

I received a call yesterday form Robert Stolv (405-632-2262 x1002) stating that Caddo County 911 was ready to order trunks into the Hinton switch and I should contact you. He didn't indicate the timeline or quantity of trunks that would be needed. Our previous PSAP connections were two trunks for Canadian Co for about 300 subscribers and two for Custer/Washita for about 150 subscribers. Caddo County will be our largest service area with about 2500 subscribers. They include portions of all six of our exchanges: Hinton, Hydro, Cedar Lake, Lookeba, Eakly and Colony. I have not received an Access Service Request (ASR) or a formal request on a letter head from Caddo County 911 with contact and billing info yet, have you? ATT's ICSC of SW50 is the primary and does the circuit engineering for Hinton (secondary ICSC-IM59). When you create the order, If it is possible to send the information to engineering, it would be good to create these trunks on alternate route protected facilities to Hinton like the previous Custer/Washita PSAP trunks with ID's 96EVXS003638 AND 39.

Switch info for Hinton:
CLLI=HINTOKXA01T
SP=005-005-076

Present PSAP Tandem connection:
CLLI=OKCYOK1ED
SP=249-130-041
TCIC=1&2 for Canadian Co
TCIC= 3&4 for Custer/Washita

Garry Findley
Hinton Telephone Co
200 W Main

5/7/2013

EXHIBIT "B"

Page 1 of 1

## Garry Findley

| | |
|---|---|
| **From:** | "GOUKER, KATHERINE" <kg3858@att.com> |
| **Date:** | Tuesday, January 08, 2013 3:52 PM |
| **To:** | <garryfindley@hintonet.net>; <jpowers@carnegietelephone.com>; <mary.doherty@tdstelecom.com>; "Jim Dixon" <jhdixon@ptci.com>; "HINKL, ERNST J" <eh7323@att.com>; <caddoe911@att.net>; <Rob@stolztelecom.com>; "CHRISTIAN, BETTY R" <bc2018@att.com>; <kfox@geo-comm.com> |
| **Attach:** | ATT00023.ics; 1-8-2013 CADDO COUNTY MSAG AND TELEPHONE NUMBER COUNT.xlsx |
| **Subject:** | caddo county database |

I know that Caddo County is wanting to turn up live near the end of the month, but from what I can see before trunks are ordered , We need to get database completed.

Katherine Gouker
Communication Consultant
AT&T Public safety Solutions E911
405 291-2106

*Caddo County Court house & 911 Center still under construction until mid April 2013, E911 Equipment couldn't be connected until about mid May 2013 due to the construction damage of the phone cables under the paved parking lot.*

2/4/2014

EXHIBIT "B"

**Exhibit G**

# CADDO COUNTY 911 COMMUNICATIONS CENTER IS IN OPERATION

**Caddo County 9-1-1** is currently receiving emergency & non-emergency calls for Police, Fire and EMS but we cannot go live with Enhanced 9-1-1 until we meet a 96% match rate between the landline phone numbers and the 9-1-1 addresses.

## We Need Your Help!

IF YOU HAVE RECEIVED A MESSAGE FROM A **GEOCOMM** REPRESENTATIVE, BUT DID NOT GET A CHANCE TO VERIFY YOUR ADDRESS WITH THEM YET:

PLEASE CALL THE **GEOCOMM**
TOLL FREE NUMBER AT:
888-436-2666 (Monday-Friday: 8:00-4:30)
AND ASK FOR THE
CADDO COUNTY PROJECT TEAM
or Fill out an online survey at:
www.caddocounty911.org

Our partner in this project, **GeoComm, Inc.** will also continue to call residents to verify their phone number and address information. These calls will take place between 10:00 am to 8:00 pm, with calls to private residences focusing on the afternoon and evening hours. If you receive a call from **GeoComm**, we would appreciate if you would provide them with your phone number and physical address information so that this can be updated in the 9-1-1 system.

*May 1, 2013*

*Anadarko Daily News*

EXHIBIT "B"

Exhibit H

EXHIBIT "B"

## Kenneth Doughty

| | |
|---|---|
| **From:** | Garry Findley <garryfindley@hintonet.net> |
| **Sent:** | Tuesday, May 21, 2013 11:15 AM |
| **To:** | Debbie Brown |
| **Cc:** | Jason Doughty; Kenneth |
| **Subject:** | Re: 911 Service |
| **Attachments:** | 911 route table.pdf |

Debbie,

This sounds simple enough and would be to an 800 number like the other 811, 211 services have. Do you have a 800 number that is routed to the 5700 number? All of my 911 calls are translated from a "destination table" (which is administrable at the Directory number level) into the "route table", as in the attachment,  and can only switch to a "trunk group". This is because all customers in each of the six exchanges have a special class mark to point them to a specific one of the four established 911 regions. Of the types of trunks I can send the 911 calls to from this table are Enhanced 911, Basic 911, 800 type trunk group or Operator. As you know we send the 911 calls to the Operator in areas that don't have direct trunks. Hopefully it won't be much longer before the database is completed and the direct E911 trunks are in service. To make major translation changes on how the 911 is sorted just for forwarding to a normalized 10 digit number in these tables would jeopardize all 911 services including the 3 counties that now have E911 connected to us during that process. This is NOT anything I would do for this temporary setup. Yes, the Caddo County people can dial 911 and reach the emergency services by Operator handling, however the fastest way is to call the listed numbers on page one of our directory as they have done for years.

Garry Findley
Hinton Telephone Co
200 W Main
PO Box 1040
Hinton, OK 73047
405-542-3262

**From:** Debbie Brown
**Sent:** Monday, May 20, 2013 11:41 AM
**To:** Garry Findley
**Subject:** 911 Service

Garry,

If you will forward 911 to Caddo County 911 Communications Center 405-247-5700, I will pay the long distance charges. I think this would be best for everyone.

Thankyou,
Debbie Davis
Caddo County 911 Director

1

EXHIBIT "B"

## AFFIDAVIT

I, Kenneth Doughty, being first duly sworn on oath, hereby state as follows:

1. I am the President of The Hinton Telephone Company of Hinton, Oklahoma, Inc ("Hinton Tel").

2. I have reviewed the "Response to Notice of Apparent Liability for Forfeiture," dated September 3, 2014, of Hinton Tel, and declare that the factual representations therein are true and correct to the best of my knowledge, information and belief.

_____
Kenneth Doughty

_____9 - 3 - 2014_____
Date

Subscribed and sworn to before me this 3rd day of September, 2014.

_____
Notary Public

ANITA WOODS
Notary Public
State of Oklahoma
Commission # 09003997 Expires 05/07/17

My Commission expires:____05/07/2017____

EXHIBIT "B"

<u>**Federal Communications Commission**</u>     **DA 15-339**

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

| | | |
|---|---|---|
| In the Matter of | ) | File No.: EB-SED-14-00016210[1] |
| | ) | |
| The Hinton Telephone Company | ) | NAL/Acct. No.: 201432100027 |
| of Hinton, Oklahoma, Inc., | ) | |
| d/b/a Hinton Telephone Company | ) | FRN: 0004365334 |

**FORFEITURE ORDER**

**Adopted: March 18, 2015**     **Released: March 18, 2015**

By the Chief, Enforcement Bureau:

**I.     INTRODUCTION**

1.     We impose a penalty of $100,000 against Hinton Telephone Company of Hinton, Oklahoma, Inc. (Hinton) for failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message—a message that instructed callers to "hang up and dial 911" to report an emergency.  This violation of the Commission's 911 rules continued for three months after Hinton learned of the problem, creating a significant threat to the life and property of Caddo County, Oklahoma, residents.  Despite knowing of this ongoing risk to public safety, Hinton did nothing to resolve the problem and returned its system to functionality only after being directed to do so by FCC investigators.  Such behavior is manifestly unacceptable and undermines the public's ability to make one of the most important calls they ever have to make—calls to first responders in times of critical need.

2.     In response to the Notice of Apparent Liability for Forfeiture (*NAL*), Hinton simply restates the same arguments we previously rejected in the *NAL* to justify its continued failure to protect the safety of its customers by following the Commission's 911 rules.  We again reject these arguments.  We are also unpersuaded by Hinton's arguments that we should reduce the amount of the penalty.  Accordingly, after reviewing Hinton's response to the *NAL*, we find no reason to cancel, withdraw, or reduce the proposed penalty, and we therefore assess the $100,000 forfeiture the Enforcement Bureau previously proposed.

**II.     BACKGROUND**

3.     In May 2013, the Commission's Public Safety and Homeland Security Bureau (PSHSB) received a complaint that Hinton was not providing basic 911 service to its Caddo County, Oklahoma, customers.[2]  Hinton stated that it previously routed its 911 calls to a live AT&T operator, but that AT&T subsequently discontinued this service and substituted an automated operator in place of the live operator.[3]  Despite knowing that 911 calls were no longer sent to a live operator—and, instead, were sent to a recording that told callers to "hang up and dial 911"[4]—Hinton failed to fix the problem by routing

---

[1] The investigation initiated under File No. EB-SED-13-00010169 was subsequently assigned File No. EB-SED-14-00016210.  Any future correspondence with the FCC concerning this matter should reflect the new case number.

[2] *The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 9228, 9229, para. 5 (Enf. Bur. 2014) (*NAL*).

[3] *Id.*

[4] *Id.* At para. 4 n.9.  The complaint received by the Commission included a recording purported to be the message heard by a caller dialing 911 on Hinton's network, which stated "Hinton Telephone Company.  The local time is. . . .  If this call is an emergency, hang up and dial 911.  To place a call, press one.  If you need additional assistance, (continued....)

EXHIBIT "C"

EXHIBIT "C"

Federal Communications Commission                                    DA 15-339

such calls directly to the Caddo County Public Safety Answer Point (PSAP) until August 2013, three months after it learned of the issue and only after PSHSB directed it to act immediately.[5] The Spectrum Enforcement Division of the Enforcement Bureau (Bureau) subsequently commenced an investigation by directing Hinton to respond to a series of inquiries into the company's provision of basic 911 service.[6]

4.      On August 4, 2014, the Bureau issued the *NAL* proposing a $100,000 forfeiture against Hinton for its apparent willful and repeated violation of Sections 64.3001 and 64.3002(d) of the Commission's rules (Rules) for failing to use reasonable judgment over a three-month period, from May 6, 2013 to August 5, 2013, when it knowingly routed 911 calls to an automated operator message.[7]

5.      On September 3, 2014, Hinton filed a response to the *NAL*, requesting that the proposed forfeiture be cancelled.[8] Hinton's NAL Response reiterates the same arguments it asserted in its earlier Letter of Inquiry (LOI) Responses,[9] which the Bureau already considered and rejected in the *NAL*. Hinton argues that, given the unique, complicated, and difficult circumstances of providing 911 service in Caddo County, it exercised reasonable judgment by routing 911 calls to a pre-recorded message while it considered and developed alternative options.[10] Hinton also argues for cancellation of the proposed forfeiture on the basis that the company has an excellent record of regulatory compliance,[11] and that the proposed forfeiture is significant for a company of Hinton's size and would adversely impact the company's ability to construct and deploy broadband service.[12] We reject each of these claims below.

(Continued from previous page) ————————————
press zero for the operator or remain on the line.  To hear your options again, press star."  Hinton did not dispute this in its NAL Response.  *See generally*, Hinton, Response to Notice of Apparent Liability (Sep. 3, 2014) (on file in EB-SED-14-00016210) (NAL Response).

[5] *Id.*

[6] *See* Letter from John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kenneth Doughty, CEO, Hinton Telephone Company (Jan. 27, 2014) (on file in EB-SED-14-00016210); Letter from John D. Poutasse, Chief, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kenneth Doughty, CEO, Hinton Telephone Company (July 10, 2014) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (May 30, 2014, 12:48 EDT) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (Jun. 12, 2014, 15:57 EDT) (on file in EB-SED-14-00016210); E-mail from Josh Zeldis, Attorney Advisor, Spectrum Enforcement Division, FCC Enforcement Bureau, to Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company (July 15, 2014, 12:33 EDT) (on file in EB-SED-14-00016210).

[7] *See NAL,* 29 FCC Rcd at 9233–35, paras. 11–14; *see also* 47 C.F.R. §§ 64.3001, 64.3002(d).

[8] NAL Response.

[9] *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (Mar. 10, 2014) (on file in EB-SED-14-00016210); Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (May 27, 2014) (on file in EB-SED-14-00016210); Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (June 10, 2014) (on file in EB-SED-13-00016210); Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (June 18, 2014) (on file in EB-SED-14-00016210); Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (July 21, 2014) (on file in EB-SED-14-00016210) (together, the LOI Responses).

[10] *See* NAL Response at 3–11.

[11] *See id.* at 2, 12.

[12] *See id.* at 12.

2

EXHIBIT "C"

## III.   DISCUSSION

6.        The Bureau proposed a forfeiture in this case in accordance with Section 503(b) of the Communications Act of 1934, as amended (Act),[13] Section 1.80 of the Rules,[14] and the Commission's *Forfeiture Policy Statement*.[15]  When we assess forfeitures, Section 503(b)(2)(E) requires that we take into account the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[16]  As discussed below, we have fully considered Hinton's response to the *NAL*, but we do not find it persuasive.  We therefore affirm the $100,000 forfeiture proposed in the *NAL*.

### A.   Hinton Acted Unreasonably by Continuing to Route 911 Calls to an Automated Message for Three Months after Notification

7.        Hinton sets forth a number of facts that it claims demonstrate that it exercised reasonable judgment in its decision to continue to route 911 calls to AT&T's operator for three months even after it learned those calls were being sent to an automated message service.[17]  According to Hinton, after it learned of the issue in May it:  (1) sought the advice of Oklahoma Corporation Commission staff; (2) placed notices in local newspapers and in customer bills informing customers they could reach various emergency numbers more quickly by dialing them directly; and (3) analyzed potential temporary solutions, each of which, according to Hinton, were fraught with difficulty.[18]  According to Hinton, the fact that it responded so quickly to PSHSB's directive to resolve the issue is a testament to the preparation that it had done.[19]

8.        As we stated in the *NAL*, we find no merit in Hinton's argument that it exercised reasonable judgment by continuing to route 911 call to AT&T's operator service for three months after discovering that AT&T had replaced its voice operator service with an automated message.[20]  Section 64.3001 of the Rules directs telecommunications carriers to transmit all 911 calls to a PSAP, a designated statewide default answering point, or to an appropriate local emergency authority.[21]  Section 64.3002(d) of the Rules imposes on telecommunications carriers the obligation to "identify an appropriate local emergency authority, based on the exercise of reasonable judgment, and complete all translation and routing necessary to deliver 911 calls to such appropriate local emergency authority. . . ."[22]

9.        As the Commission has stated, 911 service is intended to enable people everywhere to quickly connect to trained individuals who have ready access to police, fire, and health emergency service providers.[23]  After Hinton discovered that 911 calls were being routed to an automated message service, it

---

[13] 47 U.S.C. § 503(b).

[14] 47 C.F.R. § 1.80.

[15] *The Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied*, Memorandum Opinion and Order, 15 FCC Rcd 303 (1999).

[16] 47 U.S.C. § 503(b)(2)(E).

[17] *See* NAL Response at 5–9.

[18] *See id.* at 5–6, 8–9.

[19] *See id.* at 10.

[20] *See NAL*, 29 FCC Rcd at 9231–33, paras. 9–10.

[21] 47 C.F.R. § 64.3001.

[22] 47 C.F.R. § 64.3002(d).

[23] *See Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Call Systems*, Report and Order and Further Notice of Proposed Rulemaking, 11 FCC Rcd 18676, 18678–79, para. 3 (1996); *see also In the Matters of 911 Governance and Accountability Improving 911 Reliability*, Policy Statement and Notice (continued....)

EXHIBIT "C"

was unacceptable for the company to take three months without any action and to act only after being directed to do so by PSHSB staff.[24] As we determined in the *NAL*, Hinton was obligated, consistent with the requirements of Sections 64.3001 and 64.3002(d) of the Rules, to reassess its call routing protocols and ascertain whether, based on the exercise of reasonable judgment, there was an alternative appropriate local emergency authority to which it could route its 911 calls.[25] We recognize that Hinton faced challenges in the implementation of the new Caddo County 911 call center.[26] However, given the availability of a viable workaround, it was unreasonable for Hinton to wait until pressed by PSHSB staff to implement a reasonable solution.[27]

### B.   Hinton's Record of Regulatory Compliance Does Not Warrant Cancellation of the Proposed Forfeiture

10.     Hinton contends that it should not be subject to the $100,000 forfeiture proposed in the *NAL* because of its 64-year record of compliance with the Rules, its successful provision of 911 and E911 services in the other Oklahoma counties it serves, as well as its service to customers in Caddo County.[28] However, Hinton's compliance record is not spotless[29] and its successful provision of 911 and E911 services in other Oklahoma counties does not excuse or mitigate its failure over an extended period of time to use reasonable judgment in routing 911 calls in Caddo County. In addition, any good-faith efforts taken by Hinton to comply with the Rules following the Bureau's investigation is expected and generally does not serve to mitigate a forfeiture.[30] Accordingly, we decline to reduce the forfeiture on this basis.

### C.   Hinton's Desire to Improve Broadband Service to its Customers and its Purported Inability to Pay Are Not Valid Grounds for Cancellation of the Proposed Forfeiture

11.     Hinton also contends that it should not have to pay the $100,000 proposed forfeiture because such a penalty would adversely impact its ability to bring broadband services to its rural customers, and suggests that it is unable to pay the proposed forfeiture.[31] The Commission has long supported programs that assist rural communities and schools with access to modern telecommunications services, including broadband deployment. However, the Commission also has a clear interest in

(Continued from previous page) ─────────────────────────────────
of Proposed Rulemaking, 29 FCC Rcd 14208, 14209, paras. 1–3 (2014); *In the Matter of Improving 911 Reliability Reliability and Continuity of Communications Networks, Including Broadband Technologies*, Report and Order, 28 FCC Rcd 17476, 17484, para. 23 (2013).

[24] *See* NAL Response at 5.

[25] *See NAL*, 29 FCC Rcd at 9232, para. 10.

[26] *See* NAL Response at 6–8 (noting that the Caddo County Courthouse was being remodeled, new names for streets and county roads throughout the county were being assigned, and a possible number translation change to route these 911 calls would have jeopardized E911 service already implemented in other counties that Hinton served).

[27] *See id.* at 9.

[28] *See id.* at 12. Hinton also attaches a letter from Benny Bowling, Commissioner, Caddo County Board of Commissioners to Josh Zeldis, Federal Communications Commission, stating that Hinton is "doing a good job serving their subscribers with telephone service and building broadband service to the rural areas" and indicating his belief that Hinton is doing the best for their subscribers in the provisioning of E911 service. *See also id.*, Exh. A.

[29] *See In Re The Hinton Telephone Company of Hinton, Oklahoma, Inc.*, Notice of Apparent Liability for Forfeiture, 6 FCC Rcd 7002 (Mobile Servs. Div. 1991) (assessing a $7,000 penalty for failure to file a timely application for a pro forma transfer of control of Hinton).

[30] *See, e.g., R.J.'s Late Night Entm't Corp.*, Memorandum Opinion and Order, FCC 15-181 (Enf. Bur. Feb. 9, 2015); *Seawest Yacht Brokers*, Notice of Forfeiture, 9 FCC Rcd 6099, 6099, para. 7 (1994) (citations omitted); *Exec. Broad. Corp.*, Memorandum Opinion and Order, 3 FCC 2d 699, 700, para. 6 (1966); *see also Forfeiture Policy Statement*, 12 FCC Rcd at 17099, para. 22 ("[t]he Commission expects [each licensee], and it is each licensee's obligation, to know and comply with all of the Commission's rules").

[31] *See* NAL Response at 12.

EXHIBIT "C"

regulatory compliance, especially when public safety considerations like 911 reliability are compromised. Hinton has made no showing of a public benefit from cancelling the forfeiture, and provides scant evidence that the penalty would affect its plans to develop rural broadband services.[32]  Weighing the evidence at hand and the public interests at stake, we decline to cancel the forfeiture on this basis.

12.      Finally, Hinton responds with an implicit claim of financial hardship.[33]  Any claim of inability to pay must specifically identify the basis for the claim by reference to financial documentation submitted.[34]  Hinton, however, has not provided any of the required financial documentation to support a claim of financial hardship.  Consistent with our prior decisions, we therefore find that forfeiture cancellation or reduction is not warranted on this basis.[35]

## IV.     CONCLUSION

13.      Based on the record before us and in light of the applicable statutory factors, we conclude that Hinton willfully and repeatedly Sections 64.3001 and 64.3002(d) of the Rules by failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message for an extended period of time.[36]  We decline to cancel or reduce the $100,000 forfeiture proposed in the *NAL*.

## V.     ORDERING CLAUSES

14.      Accordingly, **IT IS ORDERED** that, pursuant to Section 503(b) of the Act,[37] and Section 1.80 of the Rules,[38] Hinton **IS LIABLE FOR A MONETARY FORFEITURE** in the amount of one hundred thousand dollars ($100,000) for willfully and repeatedly violating Sections 64.3001 and 64.3002(d) of the Rules.

15.      Payment of the forfeiture shall be made in the manner provided for in Section 1.80 of the Rules within thirty (30) calendar days after the release of this Forfeiture Order.[39]  If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to Section 504(a) of the Act.[40]

16.      Payment of the forfeiture must be made by check or similar instrument, wire transfer, or credit card, and must include the NAL/Account Number and FRN referenced above.  Hinton shall send electronic notification of payment to JoAnn Lucanik at joann.lucanik@fcc.gov and William Reed at william.reed@fcc.gov on the date said payment is made.  Regardless of the form of payment, a completed FCC Form 159 (Remittance Advice) must be submitted.[41]  When completing the Form 159, enter the

---

[32] *See id.*

[33] *See id.*

[34] As stated in the *NAL*, the Commission will not consider a claim of inability to pay unless the petitioner submits "(1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status." *NAL*, 29 FCC Rcd at 9236, para. 20.

[35] *See In the Matter of Indigo Wireless, Inc.*, Forfeiture Order, 29 FCC Rcd 7404, 7408, para. 9, *aff'd*, Memorandum Opinion and Order, 29 FCC Rcd 14076 (denying request for cancellation or reduction of forfeiture due to lack of adequate documentation).

[36] 47 C.F.R. §§ 64.3001, 64.3002(d).

[37] 47 U.S.C. § 503(b).

[38] 47 C.F.R. § 1.80.

[39] *Id.*

[40] 47 U.S.C. § 504(a).

[41] An FCC Form 159 and detailed instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

EXHIBIT "C"

Account Number in block number 23A (call sign/other ID) and enter the letters "FORF" in block number 24A (payment type code). Below are additional instructions that should be followed based on the form of payment selected:

- Payment by check or money order must be made payable to the order of the Federal Communications Commission. Such payments (along with completed Form 159) must be mailed to the Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001. To complete the wire transfer and ensure appropriate crediting of the wired funds, a completed Form 159 must be faxed to U.S. Bank at (314) 418-4232 on the same business day the wire transfer is initiated.

- Payment by credit card must be made by providing the required credit card information on FCC From 159 and signing and dating Form 159 to authorize the credit card payment. The completed Form 159 must then be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

17. Any request for making full payment over time under an installment plan should be sent to: Chief Financial Officer – Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[42] Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by telephone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

18. **IT IS FURTHER ORDERED** that a copy of this Forfeiture Order shall be sent by first class mail and certified mail, return receipt requested, to Kenneth Doughty, Chief Executive Officer, The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company, 200 West Main Street, Hinton, Oklahoma, 73047 and to Kendall Parrish, Comingdeer & Associates, 6011 North Robinson Avenue, Oklahoma City, Oklahoma 73118.

FEDERAL COMMUNICATIONS COMMISSION

Travis LeBlanc
Chief
Enforcement Bureau

---

[42] *See* 47 C.F.R. § 1.1914.

6

EXHIBIT "C"

ORIGINAL

**Before the
FEDERAL COMMUNICATIONS COMMISSION
Washington, D.C. 20554**

2015

In the Matter of ) File No. EB-SED-14-00016210

RECEIVED - FCC

The Hinton Telephone Company ) NAL/Acct No. 201432100027
of Hinton, Oklahoma, Inc. d/b/a )
Hinton Telephone Company ) FRN: 0004365334

APR 17 2015

Federal Communications Commission
Bureau / Office

TO: Chief, Enforcement Bureau

## PETITION FOR RECONSIDERATION

The Hinton Telephone Company of Hinton, Oklahoma, Inc. ("Hinton"), by its attorneys

and pursuant to Section 1.106 of the Commission's Rules, petitions for reconsideration of the

Enforcement Bureau's *Forfeiture Order*, DA 15-339, released March 18, 2015, in the captioned

proceeding ("*Order*"). The *Order* imposed a $100,000 forfeiture upon Hinton for alleged willful

and repeated violation of Sections 64.3001 and 64.3002(d) of the Commission's Rules by

knowingly routing 911 calls to an automated operator message for an extended period of time

(i.e., from May 6, 2013 to August 5, 2013).

Hinton requests that the *Order* be reconsidered and vacated, and the forfeiture rescinded,

because it contains material errors and omissions. First, notwithstanding the fact that the

Bureau's *NALF*[1] recognized that Caddo County, Oklahoma had approved its initial Public Safety

Answering Point ("PSAP") in December 2012 and had made a request to Hinton for the direction

of trunks to that PSAP on January 7, 2013, the Bureau ignored the applicability of Section

64.3002(e) of the Rules and its nine-month 911 transition period, and relied instead upon the no

longer applicable Section 64.3002(d).    Second, even assuming, *arguendo*, that Section

64.3002(d) had any continuing applicability and relevance once a PSAP was designated for

---

[1] The Hinton Telephone Company of Hinton, Oklahoma, Inc., *Notice of Apparent Liability for Forfeiture*, File No.
EB-SED-14-00016210, DA 14-1070, released August 4, 2014 ("*NALF*"), at para. 6.

EXHIBIT "D"

2

Caddo County, the *Order* disregarded or minimized the many instances of "reasonable judgment" that Hinton had exercised to protect the public health and safety of Caddo County residents.    In addition to the steps detailed in its September 3, 2014 response to the *NALF*, Hinton notes that the listings of direct police, fire and ambulance telephone numbers that it provided in local newspapers and customer bills during the May-August 2013 period constituted exactly the type of seven-digit and ten-digit numbers that Section 64.3003 of the Rules expressly authorized for permissive dialing during 911 transition periods.  Hinton further notes that the *Order* disregards the fact that neither the Oklahoma Corporation Commission ("OCC") nor any other Oklahoma state government agency – that is, the state authorities that are directly and primarily responsible for oversight of police, fire, ambulance and other public safety matters in Caddo County – have raised any questions or concerns regarding the reasonableness of Hinton's actions nor imposed any sanctions upon it.  Finally, the *Order* imposed a massive forfeiture upon Hinton while disregarding mitigating factors including Hinton's excellent record of providing 911 and E911 services to the other four Oklahoma counties that it serves, while placing unfair weight upon a minor and self-reported 23-year-old oversight.

### The Applicable Rule Is Section 64.3002(e) Rather Than Section 64.3002(d)

It is a well established principle of administrative law that agencies must obey their own legislative and procedural rules. See, *e.g.*, *Vitarelli v. Seaton*, 359 U.S. 535, 547 (1959); *Service v. Dulles*, 354 U.S. 363, 388-89 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

Given that Caddo County did not have a PSAP as of December 11, 2001, it is clear that Section 64.3002(e) of the Rules became applicable to Hinton's Caddo County operations when Caddo County first designated and approved a PSAP in December 2012.  At the same time, the

EXHIBIT "D"

County's December 2012 PSAP designation action removed Hinton's Caddo County operations from the scope of Section 64.3002(d) because none of that provision's specified parameters (in particular, the absence of a designated PSAP) continued to apply.

Pursuant to Section 64.3002(e), when a PSAP is designated after December 11, 2001, telecommunications carriers like Hinton have a nine-month transition period to complete the translation and routing necessary to deliver 911 calls to that PSAP. Hence, Hinton had until a date in September 2013 (nine months after Caddo County's December 2012 designation action) to complete its transition to 911 in compliance with the Commission's requirements. Hinton's initiation of 911 service to the Caddo County PSAP on August 5, 2013, took place within the permitted nine-month period, and should not have been subjected to a forfeiture, or otherwise investigated or punished as a rule violation.

### Even If Section 64.3002(d) Were Applicable, Hinton Exercised Reasonable Judgment in Caddo County

Hinton emphasizes that it has never taken the public safety of its Caddo County customers lightly. Even if Section 64.3002(d) remained applicable, in whole or part, after the Caddo County PSAP designation, Hinton exercised reasonable judgment during the December 2012-to-September 2013 period as well as the May 6, 2013-to-August 5, 2013 period in its provision of emergency telecommunications services in Caddo County.

As recognized in paragraph 9 of the *NALF*, Hinton had long operated in Caddo County without access to the PSAP, statewide default answering point, or appropriate local emergency authority 911 service options listed in Section 64.3001 of the Rules. The *NALF* conceded that Hinton's decision to route Caddo County emergency calls through AT&T's live operator "may have been reasonable" under the circumstances,[2] but the Bureau has heretofore failed to

---

[2] *NALF*, at para. 9.

EXHIBIT "D"

4

acknowledge that the problems in Caddo County during the May-to-August 2013 were precipitated by AT&T's unanticipated discontinuation of its live operator service without any notice to Hinton. As detailed in Hinton's response to the *NAL*, these problems were exacerbated: (a) by the ongoing remodeling of the Caddo County Court House in which the PSAP was to be located, and the related need to repair telecommunications lines damaged during the construction, and (b) by Hinton's ongoing conversion of its switching system from Time Division Multiplexing ("TDM") to Internet Protocol ("IP"). Meanwhile, throughout the entire period from December 2012 to August 5, 2013, Hinton worked diligently with Caddo County and AT&T to get its 911 and E911 systems and facilities deployed.

The *Order* asserts that the Bureau had already considered and rejected the foregoing arguments.[3] However, the *Order* does not explain why, in light of Section 64.3003 of the Rules, Hinton was not deemed to have exercised reasonable judgment during the May-August 2013 period when it placed notices in the local newspapers and in its customer bills[4] listing all potentially relevant first responder telephone numbers and reminding Caddo County customers that they could reach these first responders more quickly by dialing them directly. During transitions to PSAP routing like the one in which Hinton was engaged, Section 64.3003 expressly permits permissive dialing via seven-or-ten-digit emergency numbers that the public previously used to reach emergency service providers until the appropriate State or local jurisdiction determines that it is appropriate to phase out the use of such seven-or-ten-digit numbers entirely and use 911 exclusively. Given that there was no such determination from the OCC or Caddo County prior to August 5, 2013, Hinton's actions in providing local emergency number lists not only protected public safety while it was recovering from the unanticipated

---

[3] *Order*, at para. 5.
[4] Hinton Response to the *NALF*, September 3, 2014, at Exhibits D and E.

EXHIBIT "D"

5

AT&T service termination and exploring temporary patches during its ongoing 911/E911 transition, but also were compliant with the requirements of Section 64.3003.[5]

The *Order* also erroneously fails to explain why the Commission is justified in imposing a substantial forfeiture upon Hinton while the state and local government agencies having direct jurisdiction over Hinton and Caddo County public safety have made no allegations or determinations of wrongdoing. The OCC has jurisdiction over Hinton's local exchange service and intrastate toll service operations, including Caddo County 911, E911 and local emergency service calls (all of which are intrastate calls). The *Order* wholly disregarded Hinton's showing that it had discussed the Caddo County situation with the OCC staff on May 7, 2013 (the day after Hinton learned that AT&T had discontinued its live operator service), and had been given no indication that the OCC considered its 911 and other emergency service arrangements to be unsatisfactory.[6] As of the present date, Hinton has not been sanctioned by the OCC with respect to the Caddo County situation and is unaware of any pending action by the OCC in connection with this matter. Even with respect to wireless services over which the Commission traditionally exercises greater jurisdiction, the Wireless Communications and Public Safety Act of 1999 ("911 Act") gives the Commission authority only to encourage and support efforts by States to deploy comprehensive end-to-end emergency communications infrastructure and programs.[7] The 911 Act does not give the Commission express authority to mandate specific actions by telecommunications carriers – especially where such actions have not been requested by the affected state regulatory agency.

---

[5] The Section 64.3003-approved local emergency number lists were reasonably deemed by Hinton to be at least as viable of a work around as the Workaround Alternative No. 3 that was implemented under Bureau pressure on August 5, 2013. The latter workaround created phantom traffic by stripping away caller billing information and was transported over a non-standard access path.   Hinton Response to *NALF*, September 3, 2014, at p. 9.
[6] Hinton Response to the *NALF*, September 3, 2014, at pp. 5-6.
[7] Public Law 106-81, Section 3(b) (October 26, 1999)

EXHIBIT "D"

6

Hinton submits that it exercised reasonable judgment when it relied during the May-to-August 2013 period upon the advice of the OCC staff that has direct jurisdiction over its 911 and other intrastate telecommunications operations and services. The *Order* erred when it disregarded the impact and authority of the OCC advice, as well as the lack of any OCC or other State of Oklahoma complaints, investigations or sanctions against Hinton. In fact, and contrary to the intent of the 911 Act, the *Order* implicitly pre-empts the OCC and other Oklahoma state agencies by assuming federal jurisdiction over intrastate emergency communications arrangements, and imposing a substantial federal forfeiture upon intrastate arrangements which are appropriately regulated by the State of Oklahoma and which the relevant Oklahoma agencies have not claimed (much less, found) to be unlawful.

## The Order Disregarded Factors Mitigating A Forfeiture

The *Order* erroneously disregards the facts that Hinton is a small rural telephone company that serves portions of five Oklahoma counties (Blaine, Caddo, Canadian, Custer and Washita Counties), and that it has received no complaints or been involved in other controversies regarding its emergency communications services and arrangements in the other four counties. In fact, Hinton is providing wholly satisfactory 911 and/or E911 in these other four counties.

Even in Caddo County, there has been minimal controversy, as well as recognition that the transition to 911 and E911 service involved complications that were not the primary fault of Hinton or any other participant. As noted by Commissioner Benny Bowling of the Caddo County Board of Commissioners, there were challenges and frustrations for all parties involved in the 911/E911 transition process, but the job got done by working together. Mr. Bowling declared that Hinton "had its challenges with the process as well but I think they did their part as well and as fast as they could considering they were trying to stay within the regulatory rules

EXHIBIT "D"

they operate under." He stated his perception that Hinton "wants to do whatever is best for their subscribers and I feel that they did that in the provisioning of the E911 service as well."[8]

Hinton did have some disagreements with Debbie (Brown) Davis, Caddo County's 911 Director. The primary dispute arose from her demand that 911 calls be forwarded virtually immediately to the new Caddo County 911 call center's local telephone number during the month that the call center opened, in a manner that would have required a number of translation changes that would have jeopardized E911 services in the other counties served by Hinton.[9] While it understood Ms. Brown's position, Hinton exercised reasonable judgment in denying the request and protecting the emergency calling services of its non-Caddo County customers.

Finally, the *Order* erred by characterizing and denigrating Hinton's record of regulatory compliance as "not spotless" due to an innocent oversight that took place over 23 years ago, and was self-reported. The incident involved an internal corporate restructuring wherein Hinton's controlling stockholder at the time made a *pro forma* transfer of stock to a revocable trust for which he was the trustee. While the Commission's wireless licensing rules required an application to be filed, this was the type of transaction involving no actual change in management or control that few business people would normally understand to require an FCC application. It was not until the change was mentioned to its communications counsel that Hinton learned of the FCC application requirement, and self-reported the matter. No reasonable person would consider this inadvertent and innocent incident to constitute a significant blot on Hinton's overall record of compliance with Commission requirements. Because this was its only

---

[8] Letter, dated August 18, 2014, from Benny Bowling, Commissioner, Caddo County Board of Commissioners, to John Zeldis, Spectrum Enforcement Division, Enforcement Bureau, attached as Exhibit A to Hinton's September 3, 2014 response to the *NALF*.

[9] Emails to and from Garry Findley and Debbie (Brown) Davis, dated May 20 and 21, 2013, attached as Exhibit H to Hinton's September 3, 2014 response to the *NALF*.

EXHIBIT "D"

8

technical rule violation and because it occurred so many years ago, the Bureau cannot reasonably conclude that Hinton has anything other than an excellent prior record of compliance with the Commission's rules.

## Conclusion

On the basis of the foregoing, the public interest requires that the Bureau reconsider its action and vacate the *Order* due to the material errors it contains, and rescind the $100,000 forfeiture imposed upon Hinton.

Respectfully submitted,
**HINTON TELEPHONE COMPANY OF HINTON, OKLAHOMA, INC.**

By: _____

Gerard J. Duffy
Richard D. Rubino
Its Attorneys

Blooston, Mordkofsky, Dickens
 Duffy & Prendergast, LLP
2120 L Street, N.W., Suite 300
Washington, DC 20037
Telephone: (202) 659-0830

Dated: April 17, 2015

EXHIBIT "D"

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | File No.: EB-SED-14-00016210[1] |
| | ) | |
| The Hinton Telephone Company | ) | NAL/Acct. No.: 201432100027 |
| of Hinton, Oklahoma, Inc., | ) | |
| d/b/a Hinton Telephone Company | ) | FRN: 0004365334 |

## MEMORANDUM OPINION AND ORDER

**Adopted: October 27, 2015** **Released: October 27, 2015**

By the Chief, Enforcement Bureau:

## I.   INTRODUCTION

1.     We deny the Petition for Reconsideration (Petition) filed by The Hinton Telephone Company of Hinton, Oklahoma, Inc. (Hinton) seeking reconsideration of the *Forfeiture Order* issued by the Enforcement Bureau (Bureau). In the *Forfeiture Order*, the Bureau imposed a forfeiture of $100,000 against Hinton for failing to use reasonable judgment when, for a three-month period, it knowingly routed 911 calls to an automated operator message that instructed 911 callers to "hang up and dial 911." Hinton's actions created a significant threat to the life and property of Caddo County, Oklahoma residents, undermining one of the bedrock principles of the Communications Act and the Commission's rules – that reliable 911 service must be available to all Americans at all times.

2.     Upon review of the Petition and the entire record, we dismiss the Petition in part on procedural grounds and otherwise deny the Petition on the merits, pursuant to Section 1.106 of the Commission's rules.[2] Reconsideration is appropriate when the petitioner either demonstrates a material error or omission in the underlying order or raises additional arguments based on facts not known or not existing until after the petitioner's last opportunity to present such matters.[3] With respect to such additional arguments, reconsideration will also be appropriate if the Commission determines that the public interest requires their consideration.[4] Hinton raises three new arguments that it could have raised earlier, and we therefore dismiss the Petition on procedural grounds to the extent that it relies on those arguments. We also reject Hinton's one procedurally acceptable new argument on the merits. Moreover, as a separate and independent basis for our decision, we find that, if we were to consider Hinton's three procedurally unacceptable new arguments further, we would also reject them on their merits. Finally, we reject on the merits those arguments that the Bureau considered and rejected in the *Forfeiture Order*, and which Hinton repeats in its Petition. As a result, we uphold the Bureau's findings in the *Forfeiture Order* and affirm the $100,000 penalty imposed against Hinton for its violations of the Commission's 911 rules.

---

[1] The investigation initiated under File No. EB-SED-13-00010169 was subsequently assigned File No. EB-SED-14-00016210. Any future correspondence with the FCC concerning this matter should reflect the new case number.

[2] 47 C.F.R. § 1.106.

[3] *See EZ Sacramento, Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 18257, 18257, para. 2 (Enf. Bur. 2000) (citing *WWIZ, Inc.*, Memorandum Opinion and Order, 37 FCC 685, 686 (1964), *aff'd sub. nom. Lorain Journal Co. v. FCC*, 351 F.2d 824 (D.C. Cir. 1965), *cert. denied*, 383 U.S. 967 (1966)); *see also Ely Radio, LLC*, Memorandum Opinion and Order, 27 FCC Rcd 7608, 7610, para. 6 (Enf. Bur. 2012) (articulating the standard of review for Petitions for Reconsideration).

[4] 47 C.F.R. § 1.106(c)(2).

EXHIBIT "E"

## II.    BACKGROUND

3.      On March 18, 2015, the Bureau issued the *Forfeiture Order* imposing a $100,000 penalty against Hinton for willfully and repeatedly violating Sections 64.3001 and 64.3002(d) of the Commission's rules by failing to use reasonable judgment when it knowingly routed 911 calls to an automated operator message.[5]  Section 64.3001 of the Commission's rules requires telecommunications carriers to transmit all 911 calls to a Public Safety Answering Point (PSAP), to a designated statewide default answering point, or to an appropriate local emergency authority as set forth in Section 64.3002.[6]  Section 64.3002(d) of the Commission's rules provides that "[w]here no PSAP nor statewide default answering point has been designated, and no appropriate local emergency authority has been selected by an authorized state or local entity, telecommunications carriers shall identify an appropriate local emergency authority, based on the exercise of reasonable judgment, and complete all translation and routing necessary to deliver 911 calls to such appropriate local emergency authority no later than September 11, 2002."[7]

4.      On April 17, 2015, Hinton filed the Petition requesting that the *Forfeiture Order* be reconsidered and vacated, and the $100,000 penalty rescinded.[8]  The Petition reiterates arguments previously considered and rejected by the Bureau that Hinton exercised reasonable judgment in routing 911 calls to the automated operator[9] and that its purported record of compliance with the Commission's rules and provision of 911 and E911 services to other counties in Oklahoma warranted forfeiture cancellation.[10]  In addition, Hinton's Petition presents four new arguments for our consideration:  (i) that the Commission erred in ignoring the applicability of Section 64.3002(e) of the Commission's rules, which Hinton claims effectively provided it with a nine-month suspension of its Section 64.3002(d) requirement to use reasonable judgment to identify an appropriate local emergency authority and complete translation and routing of emergency calls to such authority,[11] (ii) that the Commission improperly exercised jurisdiction over intrastate 911 calls;[12] (iii) that Hinton's actions were reasonable because they were consistent with Section 64.3003 of the Commission's rules;[13] and (iv) that the Bureau exaggerated the significance of Hinton's 1991 violation of Commission rules in failing to consider Hinton's history of rule compliance as a mitigating factor.[14]

## III.    DISCUSSION

### A.    The Petition Raises New Arguments that Hinton Could Have Raised Earlier

5.      Under Section 1.106(c) of the Commission's rules, a petition for reconsideration that relies on facts or arguments not previously presented to the designated authority may be granted only if (i)

---

[5] *The Hinton Tel. Co. of Hinton, Okla., Inc.*, Forfeiture Order, 30 FCC Rcd 2308, 2312, para. 14 (Enf. Bur. 2014) (*Forfeiture Order*), *aff'g* Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 9228 (Enf. Bur. 2014) (*NAL*); 47 C.F.R. §§ 64.3001, 64.3002(d).  The *Forfeiture Order* and *NAL* include a more complete discussion of the facts and history of this case and are incorporated herein by this reference.

[6] 47 C.F.R. § 64.3001.

[7] 47 C.F.R. § 64.3002(d).

[8] The Hinton Tel. Co. of Hinton, Okla., Inc., Petition for Reconsideration (Apr. 17, 2015) (on file in EB-SED-14-00016210 (Petition).

[9] Petition at 3–5.

[10] *Id.* at 6–7.

[11] *Id.* at 2–3.

[12] *Id.* at 5–6.

[13] *Id.* at 4-5. *See* 47 C.F.R. § 64.3003.

[14] *Id.* at 7-8.

EXHIBIT "E"

the facts or arguments relate to events that have occurred or circumstances that have changed since the petitioner's last opportunity to present such matters; (ii) the facts or arguments were unknown to the petitioner, and could not have been known by the petitioner through the exercise of ordinary diligence, until after the petitioner's last opportunity to present such matters; or (iii) the Commission determines that consideration of such facts or arguments is required in the public interest.[15] Three of Hinton's four new arguments fail to meet any prong of this test: (i) the applicability of Section 64.3002(e) of the Commission's rules, (ii) that the Commission improperly exercised jurisdiction over intrastate 911 calls, and (iii) that Hinton's operations were consistent with Section 64.3003 of the Commission's rules. Each of these arguments could have been made at the previous stage of the proceeding. Moreover, Hinton has not presented any public interest justification for considering them now, and we see no basis upon which to conclude that the public interest requires such consideration. We therefore dismiss these arguments on procedural grounds, pursuant to Section 1.106(c) of the Commission's rules.[16]

**B.     The Petition's Newly Presented Arguments Provide No Basis for Reconsideration of the Forfeiture Order on the Merits**

6.     For the reasons discussed below, we reject Hinton's one procedurally acceptable new argument on the merits. Moreover, as a separate and independent basis for our decision above to dismiss Hinton's three procedurally unacceptable new arguments, we find that, if we were to consider those arguments further, we would also reject them on their merits.

**1.     The Bureau Did Not Exaggerate the Significance of Hinton's 1991 Violation of Commission Rules in Considering Hinton's History of Rule Compliance as a Mitigating Factor**

7.     Hinton's only procedurally acceptable new argument is that the *Forfeiture Order* "erred by characterizing and denigrating Hinton's record of regulatory compliance as 'not spotless' due to an innocent oversight that took place over 23 years ago, and was self-reported" and accordingly the Bureau should not have considered this minor oversight as a factor in determining whether forfeiture mitigation was warranted.[17] While Hinton's record of regulatory compliance over the past 23 years has been commendable, the *Forfeiture Order's* characterization of that record is accurate.[18] Under the rules, the Bureau is required to take into consideration a number of factors in determining the amount of a penalty, including the extent and gravity of the current violation.[19] The *Forfeiture Order* clearly indicated that Hinton's prior violation was not the only factor that militated against mitigation, stating that Hinton's "successful provision of 911 and E911 services ... does not excuse or mitigate its failure over an extended period of time to use reasonable judgment in routing 911 calls in Caddo County."[20] Prior requests for downward adjustments for compliance have been deemed inappropriate where the nature and extent of the violation was significant, as here.[21] Also, Hinton has previously enjoyed a downward adjustment for

---

[15] *See* 47 C.F.R. § 1.106(c).

[16] *See, e.g.*, *Hannspree N. Am., Inc.*, Memorandum Opinion and Order, 27 FCC Rcd 7968 (Enf. Bur. 2012) (finding petitioner failed to demonstrate that its new arguments related to changed circumstances or previously unknown facts); *Leeteck Am., Inc.*, Memorandum Opinion and Order, 27 FCC Rcd 13487 (Enf. Bur. 2012) (same).

[17] Petition at 7.

[18] *Forfeiture Order*, 30 FCC Rcd at 2311, n.29 (citing Hinton's prior violation).

[19] 47 C.F.R. § 1.80(b)(8).

[20] *Forfeiture Order*, 30 FCC Rcd at 2311, para. 10.

[21] *See, e.g. Side by Side, Inc. Toledo, Ohio*, Memorandum Opinion and Order, 27 FCC Rcd 11132, 11136, para. 8 (Enf. Bur. 2012) (noting that the number, duration, and nature of violations weighed against a reduction for history of compliance); *Application of Adelante Media of California License, LLC for Renewal of License for Station KBAA(FM) Grass Valley, California*, Memorandum Opinion and Order and Notice of Apparent Liability for Forfeiture, 28 FCC Rcd 16896, 16897, para. 7 (Media Bur. 2013) (finding a downward adjustment for a history of

EXHIBIT "E"

its history of compliance,[22] and particularly given the nature of the violations at issue in this case, repeated downward adjustments for further violations is inappropriate. Accordingly, we find that upon consideration of all the factors in this case, the *Forfeiture Order* correctly concluded that Hinton's record of compliance did not warrant a downward adjustment, and that this new argument provides no basis for reconsideration.

> **2.     Hinton Was Required to Deliver 911 Calls to an Appropriate Emergency Authority under Section 64.3002(d) of the Commission's Rules**

8.      Hinton also seeks cancellation of the forfeiture, claiming that the 911 call translation and routing obligations of Section 64.3002(d) of the Commission's rules would only apply to it in the absence of a designated PSAP.[23]  Hinton argues that because Caddo County designated a PSAP in December 2012, instead of its being subject to Section 64.3002(d), it was subject only to Section 64.3002(e), which states that "[o]nce a PSAP is designated for an area where none had existed as of December 11, 2001, telecommunications carriers shall complete the translation and routing necessary to deliver 911 calls to that PSAP within nine months of that designation."[24]  Hinton contends that Section 64.3002(e) provided it with a nine-month period to complete the translation and routing necessary to deliver 911 calls to the Caddo County PSAP without regard to any standard of reasonable conduct during that period.[25]

9.      We find no merit to this argument.  Hinton's interpretation of the Commission's rules would effectively provide telecommunications carriers an automatic nine-month suspension of the requirement in Section 64.3002(d) to use reasonable judgment to identify an appropriate local emergency authority and complete translation and routing of emergency calls to such authority as of the date a PSAP is designated to receive 911 calls.  Instead, Hinton's interpretation appears to be that during this nine-month period no requirement would apply at all.  We disagree.  Section 64.3002 needs to be read in conjunction with Section 64.3001 which imposes a sweeping, affirmative obligation on carriers such as Hinton to route all 911 calls to "a PSAP, to a designated statewide default answering point, or to an appropriate local emergency authority as set forth in § 64.3002."[26]  Section 64.3002, on the other hand, establishes rules for the transition to 911 as the universal emergency telephone number, by setting out deadlines by which the carrier must "complete all translation and routing necessary" to deliver 911 calls to the PSAP or, in the absence of a PSAP, to a set of prioritized alternatives that turn on what alternative the area in question offers.[27]  In other words, Section 64.3001 establishes the 911 transmission requirement while Section 64.3002 sets forth the methods that carriers can use to meet the requirement in Section 64.3001, establishes a hierarchy among those methods, and governs carriers' transition from one method to the next.

10.      Moreover, Hinton's interpretation also contravenes the plain meaning of Section 64.3002.[28]  Subsections (a) through (d) each set forth the obligation to "complete all translation and

---

compliance inappropriate due to extensive violations); *Application of Northeast Indiana Public Radio, Inc.*, Memorandum Opinion and Order and Notice of Apparent Liability for Forfeiture, 27 FCC Rcd 10850, 10852, para. 7 (Media Bur. 2013) (same).

[22] *See The Hinton Telephone Company of Hinton, Oklahoma, Inc.*, Memorandum Opinion and Order, 7 FCC Rcd 6643, 6644, para. 11 (Com. Car. Bur. 1992) (providing a downward adjustment for Hinton's history of overall compliance).

[23] *See* Petition at 2–3.

[24] 47 C.F.R. § 64.3002(e).

[25] *See* Petition at 2–3.

[26] 47 C.F.R. § 64.3001.

[27] 47 C.F.R. § 64.3002.

[28] 47 C.F.R. § 64.3002.

4

EXHIBIT "E"

routing necessary to deliver 911 calls" to the entity specified in the rule subsection.[29]  Subsection (e), in contrast, provides a timetable for being able to deliver 911 calls to a PSAP after it is designated for an area that previously did not have a PSAP designation.[30]  Thus, the more rational interpretation of the relationship between subsections (d) and (e) is that subsection (e) supplemented, rather than supplanted, Hinton's subsection (d) obligation to exercise reasonable judgment.  Hinton was thus required to continue to exercise reasonable judgement in its delivery of 911 calls during the nine month period in which it was establishing the necessary routing and translation functions to be able to complete calls to the designated PSAP.  Hinton's argument, to the contrary, would call for an unnecessarily strained textual reading of Section 64.3002, which is also contrary to the Commission's intent when it created its 911 rules of ensuring the completion of 911 calls.[31]  Accordingly, Hinton's argument provides no basis for reconsideration.

### 3.    The Commission Has Jurisdiction to Regulate the Provision of Intrastate 911 Calls

11.    Hinton also seeks cancellation of the forfeiture on the basis that the Commission improperly assumed jurisdiction over intrastate emergency communications, asserting that the 911 calls that it routed to an automated message were entirely intrastate.[32]  Hinton asserts further that the Commission exceeded its jurisdiction by failing to defer to advice Hinton claims it received from the Oklahoma Corporation Commission (OCC) staff.[33]  Although a significant number of issues regarding regulation of 911 services lie within state jurisdiction,[34] we find that the 911 Act gives the Commission jurisdiction over the specific issue addressed in the *Forfeiture Order*.  In the 911 Act, Congress directed the Commission to designate 911 as "the universal emergency telephone number within the United States for reporting an emergency to appropriate authorities and requesting assistance."[35]  Congress' express intent was to "encourage and facilitate the prompt deployment throughout the United States of a seamless,

---

[29] 47 C.F.R. §§ 64.3002(a)-(d).

[30] 47 C.F.R. § 64.3002(e).

[31] Hinton's interpretation contravenes the intent of the Commission's 911 rules, which were adopted to ensure that emergency calls were completed and to protect 911 callers from reaching non-responsive recorded announcements, non-working numbers, or blocked calls.  *See Implementation of 911 Act*, Fifth Report and Order, Memorandum Opinion and Order on Reconsideration, 16 FCC Rcd 22264, 22274–75, paras. 23, 27 (2001) (noting that some 911 callers were receiving "recorded announcement[s] that a non-working number has been reached" and that the 911 rules were designed to "eliminate or lessen those occurrences to the extent feasible," and recognizing the "overriding public interest for all emergency calls to be completed and not dropped for any reason" and that the 911 rules "ensure that there is a destination to which emergency calls can be delivered").

[32] *See* Petition at 5.

[33] *Id.* at 6.  As a separate matter, Hinton has not placed adequate evidence in the record in this proceeding regarding the advice it maintains it received from OCC staff.  The sole evidence of such advice that Hinton cites is an e-mail from Hinton's outside counsel to Hinton's president, claiming that OCC staff "seemed comfortable that Hinton has not done anything wrong."  *See* Letter from Kendall Parish, Ron Comingdeer & Associates, Counsel for Hinton Telephone Company, to Josh Zeldis, Spectrum Enforcement Division, FCC Enforcement Bureau (June 18, 2014) (on file in EB-SED-14-00016210).  Nevertheless, assuming for the sake of argument that Hinton had provided adequate support for this claim, any advice it had received from OCC staff would not form any basis for challenging the Commission's well-established authority pursuant to Federal law to adopt rules governing the provision of 911 service.

[34] For a brief summary of Federal and state jurisdiction in the area of 911 service administration, see *Framework for Next Generation 911 Deployment, Notice of Inquiry*, PS Docket No. 10-255, 25 FCC Rcd 17869, 17895-96 (para. 83) (2010).

[35] *See* Wireless Communications and Public Safety Act of 1999, Pub. L. No. 106-81, 113 Stat. 1286, § 3(a) (1999) (codified at 47 U.S.C. § 251(e)(3)) (911 Act).

EXHIBIT "E"

ubiquitous, and reliable end-to-end infrastructure for communications … to meet the Nation's public safety … needs."[36]  Pursuant to the 911 Act, the Commission adopted Sections 64.3001 and 64.3002 to implement nationwide standards for 911 service.[37]  With these rules, the Commission sought "to ensure that the Congressional goals of the 911 Act for an expanded and improved nationwide emergency communications system are implemented effectively and efficiently."[38]  The role that Congress envisioned for the Commission and its rules could not be carried out if the Commission could not require carriers to have the infrastructure required to permit the transmission, translation, and routing "necessary to deliver 911 calls" to the appropriate local emergency authority.[39]  Hinton's argument that the Commission lacks jurisdiction would effectively nullify the 911 Act and the Commission's 911 rules promulgated thereunder.  Accordingly, we disagree with Hinton's assertion that the Commission lacks the authority to enforce its rules for provisioning 911 calls, and find that Hinton's argument provides no basis for reconsideration.

      **4.**      **Hinton's Compliance with Section 64.3003 of the Commission's Rules Did Not Thereby Render Its Actions Reasonable under Sections 64.3001 and 64.3002 of the Commission's Rules**

12.      In its Petition, Hinton also argues that "in light of Section 64.3003 of the Rules" the Commission should have found that it had "exercised reasonable judgment during the May-August 2013 period" because "Section 64.3003 expressly permits permissive dialing via seven-or-ten-digit emergency numbers that the public previously used to reach emergency service providers until the appropriate State or local jurisdiction determines that it is appropriate to phase out the use of such seven-or-ten-digit numbers entirely and use 911 exclusively."[40]  Hinton further argues that "[g]iven there was no such determination from the OCC or Caddo County prior to August 5, 2013, Hinton's actions in providing local emergency number lists … were compliant with the requirements of Section 64.3003."[41]  While Hinton is correct that some seven-to-ten-digit emergency service is permitted under some circumstances under Section 64.3003, that section is not relevant to this proceeding.  This is because, where 911 service is provided, it must be provided in compliance with Sections 64.3001 and 64.3002.  For reasons set forth in the *Hinton Forfeiture Order* and this reconsideration order, Hinton's provision of 911 service did not comply with Sections 64.3001 and 64.3002 during the time in question.  Thus this argument also provides no basis for reconsideration.

      **C.**      **The Petition's Previously-Presented Arguments Provide No Basis for Reconsideration of the *Forfeiture Order***

13.      Hinton raises a number of arguments that we considered and rejected in the *Forfeiture Order*.  Among other things, Hinton again challenges the Bureau's determination that the company violated Sections 64.3001 and 64.3002(d) when it continued to knowingly route 911 calls to the automated operator, contending that its alleged unique circumstances in upgrading its switching system, its actions to explore temporary patches during its then ongoing 911 transition, and its placement of newspaper and bill insert notices listing telephone numbers of relevant first responders, as well as construction at the planned PSAP location, demonstrate it exercised reasonable judgement in its provision

---

[36] *Id.* § 2(b).

[37] *See Implementation of 911 Act*, Fifth Report and Order, Memorandum Opinion and Order on Reconsideration, 16 FCC Rcd 22264, 22267–74, paras. 6, 23–25 (2001).

[38] *Id.* at 22265, para. 1.

[39] *See* 47 C.F.R. §§ 64.3001, 64.3002.

[40] Petition at 4.

[41] Petition at 4-5.

EXHIBIT "E"

of emergency telecommunications services in Caddo County.[42]  In the *Forfeiture Order*, however, the Bureau fully considered and rejected Hinton's arguments that these factors show it had exercised reasonable judgment for the three month period after it learned that 911 calls were being routed to an automated operator, and we reject Hinton's arguments in its Petition for Reconsideration for the same reasons.[43]

14.      Hinton also reiterates its argument that, except for its self-disclosed *pro forma* transfer of control violation that occurred 23 years ago, its overall record of regulatory compliance with the Commission's requirements and its record of providing 911 and/or E911 service in the four other Oklahoma counties it serves provides a basis for cancellation of the proposed forfeiture.[44]  As noted, however, in the *Forfeiture Order* the Bureau fully considered and rejected these arguments, concluding Hinton's compliance record did not excuse or mitigate its failure over an extended period of time to use reasonable judgment in routing 911 calls in Caddo County.[45]  There is nothing in Hinton's petition that would provide adequate justification for revisiting this issue.  Accordingly, we reject this argument as merely reiterative of an argument previously raised by Hinton and fully considered and rejected by the Bureau in its *Forfeiture Order*.[46]

## IV.    ORDERING CLAUSES

15.      Accordingly, **IT IS ORDERED** that, pursuant to Section 405 of the Communications Act of 1934, as amended (Act), and Section 1.106 of the Commission's rules, the Petition for Reconsideration filed by Hinton is hereby **DENIED**.[47]

16.      **IT IS FURTHER ORDERED** that, pursuant to Section 503(b) of the Act and Sections 0.111, 0.311, and 1.80 of the Commission's rules, Hinton **IS LIABLE FOR A MONETARY FORFEITURE** of one hundred thousand dollars ($100,000) for willfully and repeatedly violating Sections 64.3001 and 64.3002(d) of the Commission's rules.[48]

17.      Payment of the forfeiture shall be made in the manner provided for in Section 1.80 of the Commission's rules within thirty (30) calendar days after the release date of this Memorandum Opinion and Order.[49]  If the forfeiture is not paid within the period specified, the case may be referred to the U.S. Department of Justice for enforcement of the forfeiture pursuant to Section 504(a) of the Act.[50]

18.      Payment of the forfeiture must be made by check or similar instrument, wire transfer, or credit card, and must include the NAL/Account Number and FRN referenced above.  Hinton shall send electronic notification of payment to JoAnn Lucanik at JoAnn.Lucanik@fcc.gov and William Reed at william.reed@fcc.gov on the date said payment is made.  Regardless of the form of payment, a completed

---

[42] Petition at 3–5.

[43] *See Forfeiture Order*, 30 FCC Rcd at 2310–11, paras. 7–9.

[44] Petition at 2, 6–8.

[45] *See Forfeiture Order*, 30 FCC Rcd at 2311, para. 10.

[46] *See* 47 C.F.R. § 1.106(p)(3); *N. Cnty. Broad. Corp.*, Memorandum Opinion and Order, 29 FCC Rcd 13261 (2014) (denying petition raising two issues on review, both of which were argued previously several times before the Bureau and rejected).

[47] 47 U.S.C. § 405; 47 C.F.R. § 1.106.

[48] 47 U.S.C. § 503(b); 47 C.F.R. §§ 0.111, 0.311, 1.80, 64.3001, 64.3002(d).

[49] 47 C.F.R. § 1.80.

[50] 47 U.S.C. § 504(a).

EXHIBIT "E"

FCC Form 159 (Remittance Advice) must be submitted.[51]  When completing the FCC Form 159, enter the Account Number in block number 23A (call sign/other ID) and enter the letters "FORF" in block number 24A (payment type code).  Below are additional instructions that should be followed based on the form of payment selected:

- Payment by check or money order must be made payable to the order of the Federal Communications Commission.  Such payments (along with the completed Form 159) must be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  To complete the wire transfer and ensure appropriate crediting of the wired funds, a completed Form 159 must be faxed to U.S. Bank at (314) 418-4232 on the same business day the wire transfer is initiated.

- Payment by credit card must be made by providing the required credit card information on FCC Form 159 and signing and dating the Form 159 to authorize the credit card payment.  The completed Form 159 must then be mailed to Federal Communications Commission, P.O. Box 979088, St. Louis, MO 63197-9000, or sent via overnight mail to U.S. Bank – Government Lockbox #979088, SL-MO-C2-GL, 1005 Convention Plaza, St. Louis, MO 63101.

19.    Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, S.W., Room 1-A625, Washington, D.C. 20554.[52]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

20.    **IT IS FURTHER ORDERED** that a copy of this Memorandum Opinion and Order shall be sent by first class mail and certified mail, return receipt requested, to Kenneth Doughty, Chief Executive Officer, The Hinton Telephone Company of Hinton, Oklahoma, Inc., d/b/a Hinton Telephone Company, 200 West Main Street, Hinton, Oklahoma 73047; Kendall Parrish, Comingdeer & Associates, 6011 North Robinson Avenue, Oklahoma City, Oklahoma 73118; and to Gerard J. Duffy, Blooston, Mordkofsky, Dickens, Duffy & Prendergast, LLP, Suite 300, 2120 L Street NW, Washington, DC 20037.

FEDERAL COMMUNICATIONS COMMISSION

Travis LeBlanc
Chief
Enforcement Bureau

---

[51] An FCC Form 159 and detailed instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[52] *See* 47 C.F.R. § 1.1914.

EXHIBIT "E"

JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

UNITED STATES OF AMERICA,

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
R.D. EVANS, JR., Assistant United States Attorney, Louisiana Bar
Number 20805, 210 Park Avenue, Suite 400, Oklahoma City, OK 73102
(405) 553-8700, (405) 553-8884 fax, don.evans@usdoj.gov

## DEFENDANTS

THE HINTON TELEPHONE COMPANY OF HINTON, OKLAHOMA, INC., d/b/a HINTON TELEPHONE COMPANY

County of Residence of First Listed Defendant    Caddo County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
         Plaintiff

☐ 2   U.S. Government
         Defendant

☐ 3   Federal Question
         *(U.S. Government Not a Party)*

☐ 4   Diversity
         *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** — **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane — ☐ 365 Personal Injury - Product Liability | ☒ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability — ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability — ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability — **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle — ☐ 370 Other Fraud | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability — ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury — ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice — ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** — **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights — **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting — ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment — ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations — ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment — ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other — **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education — ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | ☐ 555 Prison Condition | | | |
| | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding

☐ 2   Removed from State Court

☐ 3   Remanded from Appellate Court

☐ 4   Reinstated or Reopened

☐ 5   Transferred from Another District *(specify)*

☐ 6   Multidistrict Litigation - Transfer

☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 USC § 504

Brief description of cause:
Recovery of monetary forfeiture assessed by FCC for Defendant's violations of Communications Act of 1934

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $
100,000.00

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
07/03/2018

SIGNATURE OF ATTORNEY OF RECORD
s// R.D. Evans, Jr.

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

| Print | Save As... | Reset |
|---|---|---|

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)**   **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)**   **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)**   **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**   **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below**; NOTE: federal question actions take precedence over diversity cases.**)

**III.**   **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**   **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**   **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**   **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.**   **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**   **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.